# K MART CORP. *v.* CARTIER, INC., ET AL.

No. 86–495.   Argued October 6, 1987—Reargued April 26, 1988—Decided May 31, 1988*

---

*Together with No. 86–624, *47th Street Photo, Inc.* v. *Coalition to Preserve the Integrity of American Trademarks et al.*, and No. 86–625, *United States et al.* v. *Coalition to Preserve the Integrity of American Trademarks et al.*, also on certiorari to the same court.

282

KENNEDY, J., announced the judgment of the Court and delivered an opinion of the Court with respect to Parts I and II–A, in which REHNQUIST, C. J., and WHITE, BLACKMUN, O'CONNOR, and SCALIA, JJ., joined, an opinion of the Court with respect to Part II–C, in which REHNQUIST, C. J., and BLACKMUN, O'CONNOR, and SCALIA, JJ., joined, and an opinion with respect to Part II–B, in which WHITE, J., joined. BRENNAN, J., filed an opinion concurring in part and dissenting in part, in which MARSHALL and STEVENS, JJ., joined, and in Part IV of which WHITE, J., joined, *post*, p. 295. SCALIA, J., filed an opinion concurring in part and dissenting in part, in which REHNQUIST, C. J., and BLACKMUN and O'CONNOR, JJ., joined, *post*, p. 318.

*Deputy Solicitor General Cohen* reargued the cause for petitioners in No. 86–625. With him on the briefs were *Solicitor General Fried, Assistant Attorney General Willard, Deputy Assistant Attorney General Spears, Jeffrey P. Minear, David M. Cohen, Robert V. Zener,* and *Alfonso Robles. Nathan Lewin* reargued the cause for petitioners in Nos. 86–495 and 86–624. With him on the briefs for petitioner in No. 86–624 was *Jamie S. Gorelick. Robert W. Steele* argued the cause for petitioners in Nos. 86–495 and 86–624 on the original argument. With him on the briefs for petitioner in No. 86–495 were *Robert E. Hebda* and *James C. Tuttle.*

*William H. Allen* reargued the cause for respondents. With him on the briefs were *Eugene A. Ludwig, Scott D. Gilbert,* and *Elizabeth V. Foote.*†

JUSTICE KENNEDY announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II–A, and II–C, and an opinion with respect to Part II–B, in which WHITE, J., joined.

A gray-market good is a foreign-manufactured good, bearing a valid United States trademark, that is imported without the consent of the United States trademark holder. These cases present the issue whether the Secretary of the Treasury's regulation permitting the importation of certain gray-market goods, 19 CFR § 133.21 (1987), is a reasonable agency interpretation of § 526 of the Tariff Act of 1930 (1930 Tariff Act), 46 Stat. 741, as amended, 19 U. S. C. § 1526.

---

†Briefs of *amici curiae* urging reversal were filed for the State of Washington by *Kenneth O. Eikenberry,* Attorney General, and *John G. Hennen,* Senior Assistant Attorney General; for the American Free Trade Association by *Stephen Kurzman, Robert Ullman,* and *Steven R. Trost;* for the Consumers Union of U. S., Inc., by *Alan Mark Silbergeld;* for Darby Dental Supply Co. et al. by *Robert V. Marrow;* for the National Association of Catalog Showroom Merchandisers by *Richard B. Kelly* and *Thomas P. Mohen;* for the National Mass Retailing Institute by *William D. Coston* and *Robert J. Verdisco;* and for Progress Trading Co. by *William F. Sondericker, Robert L. Hoegle,* and *Frank W. Gaines, Jr.*

Briefs of *amici curiae* urging affirmance were filed for American Cyanamid Co. et al. by *David Ladd* and *Thomas W. Kirby;* for the American Intellectual Property Law Association, Inc., by *Neil A. Smith;* for Duracell Inc. by *James N. Bierman, Jay N. Varon, Sheila McDonald Gill,* and *Gregg A. Dwyer;* for Lever Brothers Co. by *Robert P. Devlin;* for the Motor Vehicle Manufacturers Association of the United States, Inc., by *William H. Crabtree;* for the United States Trademark Association by *Marie V. Driscoll;* and for Yamaha International Corp. et al. by *Robert E. Wagner* and *Robert E. Browne.*

*Harold C. Wegner, Barry E. Bretschneider, Donald R. Dinan, Charles F. Schill,* and *Albert P. Halluin* filed a brief for Cetus Corp. as *amicus curiae.*

I

A

. The gray market arises in any of three general contexts. The prototypical gray-market victim (case 1) is a domestic firm that purchases from an independent foreign firm the rights to register and use the latter's trademark as a United States trademark and to sell its foreign-manufactured products here. Especially where the foreign firm has already registered the trademark in the United States or where the product has already earned a reputation for quality, the right to use that trademark can be very valuable. If the foreign manufacturer could import the trademarked goods and distribute them here, despite having sold the trademark to a domestic firm, the domestic firm would be forced into sharp intrabrand competition involving the very trademark it purchased. Similar intrabrand competition could arise if the foreign manufacturer markets its wares outside the United States, as is often the case, and a third party who purchases them abroad could legally import them. In either event, the parallel importation, if permitted to proceed, would create a gray market that could jeopardize the trademark holder's investment.

The second context (case 2) is a situation in which a domestic firm registers the United States trademark for goods that are manufactured abroad by an affiliated manufacturer. In its most common variation (case 2a), a foreign firm wishes to control distribution of its wares in this country by incorporating a subsidiary here. The subsidiary then registers under its own name (or the manufacturer assigns to the subsidiary's name) a United States trademark that is identical to its parent's foreign trademark. The parallel importation by a third party who buys the goods abroad (or conceivably even by the affiliated foreign manufacturer itself) creates a gray market. Two other variations on this theme occur when an American-based firm establishes abroad a manufacturing subsidiary corporation (case 2b) or its own unincorporated manufacturing division (case 2c) to produce its United States trade-

marked goods, and then imports them for domestic distribution. If the trademark holder or its foreign subsidiary sells the trademarked goods abroad, the parallel importation of the goods competes on the gray market with the holder's domestic sales.

In the third context (case 3), the domestic holder of a United States trademark *authorizes* an independent foreign manufacturer to use it. Usually the holder sells to the foreign manufacturer an exclusive right to use the trademark in a particular foreign location, but conditions the right on the foreign manufacturer's promise not to import its trademarked goods into the United States. Once again, if the foreign manufacturer or a third party imports into the United States, the foreign-manufactured goods will compete on the gray market with the holder's domestic goods.

### B

Until 1922, the Federal Government did not regulate the importation of gray-market goods, not even to protect the investment of an independent purchaser of a foreign trademark, and not even in the extreme case where the independent foreign manufacturer breached its agreement to refrain from direct competition with the purchaser. That year, however, Congress was spurred to action by a Court of Appeals decision declining to enjoin the parallel importation of goods bearing a trademark that (as in case 1) a domestic company had purchased from an independent foreign manufacturer at a premium. See *A. Bourjois & Co.* v. *Katzel*, 275 F. 539 (CA2 1921), rev'd, 260 U. S. 689 (1923).

In an immediate response to *Katzel*, Congress enacted § 526 of the Tariff Act of 1922, 42 Stat. 975. That provision, later reenacted in identical form as § 526 of the 1930 Tariff Act, 19 U. S. C. § 1526, prohibits importing

"into the United States any merchandise of foreign manufacture if such merchandise . . . bears a trademark owned by a citizen of, or by a corporation or association created or organized within, the United States, and reg-

istered in the Patent and Trademark Office by a person domiciled in the United States . . . , unless written consent of the owner of such trademark is produced at the time of making entry." 19 U. S. C. § 1526(a).[1]

The regulations implementing § 526 for the past 50 years have not applied the prohibition to all gray-market goods. The Customs Service regulation now in force provides generally that "[f]oreign-made articles bearing a trademark identical with one owned and recorded by a citizen of the United States or a corporation or association created or organized within the United States are subject to seizure and forfeiture as prohibited importations." 19 CFR § 133.21(b) (1987).[2]

---

[1] The full text of § 526(a), as codified, 19 U. S. C. § 1526(a), is as follows:

"(a) Importation prohibited

"Except as provided in subsection (d) of this section [an exception added in 1978 for the importation of articles for personal use], it shall be unlawful to import into the United States any merchandise of foreign manufacture if such merchandise, or the label, sign, print, package, wrapper, or receptacle, bears a trademark owned by a citizen of, or by a corporation or association created or organized within, the United States, and registered in the Patent and Trademark Office by a person domiciled in the United States, under the provisions of sections 81 to 109 of title 15, and if a copy of the certificate of registration of such trademark is filed with the Secretary of the Treasury, in the manner provided in section 106 of said title 15, unless written consent of the owner of such trademark is produced at the time of making entry."

[2] The Customs Service regulation provides:

"§ 133.21. Restrictions on importations of articles bearing recorded trademarks and trade names.

"(a) *Copying or simulating marks or names.* Articles of foreign or domestic manufacture bearing a mark or name copying or simulating a recorded trademark or trade name shall be denied entry and are subject to forfeiture as prohibited importations. A 'copying or simulating' mark or name is an actual counterfeit of the recorded mark or name or is one which so resembles it as to be likely to cause the public to associate the copying or simulating mark with the recorded mark or name.

"(b) *Identical trademark.* Foreign-made articles bearing a trademark identical with one owned and recorded by a citizen of the United States or a

But the regulation furnishes a "common-control" exception from the ban, permitting the entry of gray-market goods manufactured abroad by the trademark owner or its affiliate:

> "(c) *Restrictions not applicable.* The restrictions . . . do not apply to imported articles when:
>
> "(1) Both the foreign and the U. S. trademark or trade name are owned by the same person or business entity; [or]
>
> "(2) The foreign and domestic trademark or trade name owners are parent and subsidiary companies or are otherwise subject to common ownership or control. . . ."

corporation or association created or organized within the United States are subject to seizure and forfeiture as prohibited importations.

"(c) *Restrictions not applicable.* The restrictions set forth in paragraphs (a) and (b) of this section do not apply to imported articles when:

"(1) Both the foreign and the U. S. trademark or trade name are owned by the same person or business entity;

"(2) The foreign and domestic trademark or trade name owners are parent and subsidiary companies or are. otherwise subject to common ownership or control (see §§ 133.2(d) [defining "common ownership and common control"] and 133.12(d) [providing that application to record trademark must report identity of any affiliate that uses same trade name abroad]);

"(3) The articles of foreign manufacture bear a recorded trademark or trade name applied under authorization of the U. S. owner;

"(4) The objectionable mark is removed or obliterated prior to importation in such a manner as to be illegible and incapable of being reconstituted, for example by:

"(i) Grinding off imprinted trademarks wherever they appear;

"(ii) Removing and disposing of plates bearing a trademark or trade name;

"(5) The merchandise is imported by the recordant of the trademark or trade name or his designate;

"(6) The recordant gives written consent to an importation of articles otherwise subject to the restrictions set forth in paragraphs (a) and (b) of this section, and such consent is furnished to appropriate Customs officials; or

"(7) The articles of foreign manufacture bear a recorded trademark and the personal exemption is claimed and allowed under § 148.55 of this chapter." 19 CFR §§ 133.21(a), (b), (c) (1987).

The Customs Service regulation further provides an "authorized-use" exception, which permits importation of gray-market goods where

"(3) [t]he articles of foreign manufacture bear a recorded trademark or trade name applied under authorization of the U. S. owner . . . ." 19 CFR § 133.21(c) (1987).

Respondents, an association of United States trademark holders and two of its members, brought suit in Federal District Court in February 1984, seeking both a declaration that the Customs Service regulation, 19 CFR §§ 133.21(c)(1)–(3) (1987), is invalid and an injunction against its enforcement. *Coalition to Preserve the Integrity of American Trademarks* v. *United States*, 598 F. Supp. 844 (DC 1984). They asserted that the common-control and authorized-use exceptions are inconsistent with § 526 of the 1930 Tariff Act.[3] Petitioners K mart and 47th Street Photo intervened as defendants.

The District Court upheld the Customs Service regulation, 598 F. Supp., at 853, but the Court of Appeals reversed, *Coalition to Preserve the Integrity of American Trademarks* v. *United States*, 252 U. S. App. D. C. 342, 790 F. 2d 903 (1986) (hereinafter *COPIAT*), holding that the Customs Service regulation was an unreasonable administrative interpretation of § 526. We granted certiorari, 479 U. S. 1005 (1986), to resolve a conflict among the Courts of Appeals. Compare *Vivitar Corp.* v. *United States*, 761 F. 2d 1552, 1557–1560 (CA Fed. 1985), aff'g 593 F. Supp. 420 (Ct. Int'l Trade 1984), cert. denied, 474 U. S. 1055 (1986); and *Olympus Corp.* v. *United States*, 792 F. 2d 315, 317–319 (CA2 1986), aff'g 627 F.

---

[3] Respondents sued the United States, the Secretary of the Treasury, and the Commissioner of Customs. They also asserted that the Customs Service regulation was inconsistent with § 42 of the Lanham Trade-Mark Act, 15 U. S. C. § 1124, which prohibits the importation of goods bearing marks that "copy or simulate" United States trademarks. That issue is not before us.

Supp. 911 (EDNY 1985), cert. pending, No. 86–757, with *COPIAT, supra,* at 346–355, 790 F. 2d, at 907–916. In an earlier opinion, we affirmed the Court of Appeals' conclusion that the District Court had jurisdiction, and set the cases for reargument on the merits. 485 U. S. 176 (1988).

A majority of this Court now holds that the common-control exception of the Customs Service regulation, 19 CFR §§ 133.21(c)(1)–(2) (1987), is consistent with § 526. See *post,* at 309–310 (opinion of BRENNAN, J.). A different majority, however, holds that the authorized-use exception, 19 CFR § 133.21(c)(3) (1987), is inconsistent with § 526. See *post,* at 328–329 (opinion of SCALIA, J.). We therefore affirm the Court of Appeals in part and reverse in part.

## II

### A

In determining whether a challenged regulation is valid, a reviewing court must first determine if the regulation is consistent with the language of the statute. "If the statute is clear and unambiguous 'that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.' . . . The traditional deference courts pay to agency interpretation is not to be applied to alter the clearly expressed intent of Congress." *Board of Governors, FRS* v. *Dimension Financial Corp.,* 474 U. S. 361, 368 (1986), quoting *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837, 842–843 (1984). See also *Mills Music, Inc.* v. *Snyder,* 469 U. S. 153, 164 (1985). In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole. *Bethesda Hospital Assn.* v. *Bowen,* 485 U. S. 399, 403–405 (1988); *Offshore Logistics, Inc.* v. *Tallentire,* 477 U. S. 207, 220–221 (1986). If the statute is silent or ambiguous with respect to the specific issue addressed by the regulation, the question becomes whether the agency

regulation is a permissible construction of the statute. See *Chevron, supra*, at 843; *Chemical Manufacturers Assn. v. Natural Resources Defense Council, Inc.*, 470 U. S. 116, 125 (1985). If the agency regulation is not in conflict with the plain language of the statute, a reviewing court must give deference to the agency's interpretation of the statute. *United States* v. *Boyle*, 469 U. S. 241, 246, n. 4 (1985).

## B

Following this analysis, I conclude that subsections (c)(1) and (c)(2) of the Customs Service regulation, 19 CFR §§ 133.21 (c)(1) and (c)(2) (1987), are permissible constructions designed to resolve statutory ambiguities. All Members of the Court are in agreement that the agency may interpret the statute to bar importation of gray-market goods in what we have denoted case 1 and to permit the imports under case 2a. See *post*, at 296, 298–299 (opinion of BRENNAN, J.); *post*, at 318 (opinion of SCALIA, J.). As these writings state, "owned by" is sufficiently ambiguous, in the context of the statute, that it applies to situations involving a foreign parent, which is case 2a. This ambiguity arises from the inability to discern, from the statutory language, which of the two entities involved in case 2a can be said to "own" the United States trademark if, as in some instances, the domestic subsidiary is wholly owned by its foreign parent.

A further statutory ambiguity contained in the phrase "merchandise of foreign manufacture," suffices to sustain the regulations as they apply to cases 2b and 2c. This ambiguity parallels that of "owned by," which sustained case 2a, because it is possible to interpret "merchandise of foreign manufacture" to mean (1) goods manufactured in a foreign country, (2) goods manufactured by a foreign company, or (3) goods manufactured in a foreign country by a foreign company. Given the imprecision in the statute, the agency is entitled to choose any reasonable definition and to interpret the statute to say that goods manufactured by a foreign subsid-

iary or division of a domestic company are not goods "of foreign manufacture."[4]

## C

### (1)

Subsection (c)(3), 19 CFR § 133.21(c)(3) (1987), of the regulation, however, cannot stand. The ambiguous statutory phrases that we have already discussed, "owned by" and

---

[4] I disagree with JUSTICE SCALIA's reasons for declining to recognize this ambiguity. See *post*, at 319–323. First, the threshold question in ascertaining the correct interpretation of a statute is whether the language of the statute is clear or arguably ambiguous. The purported gloss any party gives to the statute, or any reference to legislative history, is in the first instance irrelevant. Further, I decline to assign any binding or authoritative effect to the particular verbiage JUSTICE SCALIA highlights. The quoted phrases are simply the Government's explanation of the practical effect the current regulation has in applying the statute, and come from the statement-of-the-case portion of its petition for a writ of certiorari.

Additionally, I believe that agency regulations may give a varying interpretation of the same phrase when that phrase appears in different statutes and different statutory contexts. There may well be variances in purpose or circumstance that have led the agency to adopt and apply dissimilar interpretations of the phrase "of foreign manufacture" in other regulations implementing different statutes.

I also disagree that our disposition necessarily will engender either enforcement problems for the Customs Service or problems we are unaware of arising out of our commercial treaty commitments to foreign countries. Initially, it is reasonable to think that any such problems or objections would have arisen before now since it is the current interpretation of the regulations we are sustaining. Second, I believe that the regulation speaks to the hypothetical situation JUSTICE SCALIA poses, and that the firm with the United States trademark could keep out "gray-market imports manufactured abroad by the other American firms," *post*, at 320, because the regulation allows a company justifiably invoking the protection of the statute to bar the importation of goods of foreign or domestic manufacture. 19 CFR § 133.21(a) (1987). In this instance, the domestic firm with the United States trademark could invoke the protection of the statute (case 1) and bar the importation of the other domestic firm's product manufactured abroad even though our interpretation of the phrase "of foreign manufacture" would characterize these latter goods to be of domestic manufacture.

"merchandise of foreign manufacture," are irrelevant to the proscription contained in subsection (3) of the regulation. This subsection of the regulation denies a domestic trademark holder the power to prohibit the importation of goods made by an independent foreign manufacturer where the domestic trademark holder has authorized the foreign manufacturer to use the trademark. Under no reasonable construction of the statutory language can goods made in a foreign country by an independent foreign manufacturer be removed from the purview of the statute.

### (2)

The design of the regulation is such that the subsection of the regulation dealing with case 3, § 133.21(c)(3), is severable. Cf. *Board of Governors, FRS* v. *Dimension Financial Corp.*, 474 U. S., at 368 (invalidating a Federal Reserve Board definition of "bank" in 12 CFR § 225.2(a)(1) (1985), but leaving intact the remaining parts of the regulation). The severance and invalidation of this subsection will not impair the function of the statute as a whole, and there is no indication that the regulation would not have been passed but for its inclusion. Accordingly, subsection (c)(3) of § 133.21 must be invalidated for its conflict with the unequivocal language of the statute.

### III

We hold that the Customs Service regulation is consistent with § 526 insofar as it exempts from the importation ban goods that are manufactured abroad by the "same person" who holds the United States trademark, 19 CFR § 133.21(c)(1) (1987), or by a person who is "subject to common . . . control" with the United States trademark holder, § 133.21(c)(2). Because the authorized-use exception of the regulation, § 133.21(c)(3), is in conflict with the plain language of the statute, that provision cannot stand. The judgment of the

Court of Appeals is therefore reversed insofar as it invalidated §§ 133.21(c)(1) and (c)(2), but affirmed with respect to § 133.21(c)(3).

*It is so ordered.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE STEVENS join, and with whom JUSTICE WHITE joins as to Part IV, concurring in part and dissenting in part.

Section 526 of the Tariff Act of 1930 (1930 Tariff Act), 46 Stat. 741, as amended, 19 U. S. C. § 1526, provides extraordinary protection to certain holders of trademarks registered in the United States. A United States trademark holder covered by § 526 can prohibit or condition all importation of merchandise bearing its trademark, thereby gaining a virtual monopoly, free from intrabrand competition, on domestic distribution of any merchandise bearing the trademark. For half a century the Secretary of the Treasury has consistently interpreted § 526 to grant this exclusionary power not to all United States trademark holders, but only to certain ones with specifically defined relationships to the manufacturer. Specifically, Treasury has a longstanding practice, expressed currently in 19 CFR § 133.21 (1987) (Customs Service regulation), of not extending § 526's extraordinary protection to the very firm that manufactured the gray-market merchandise abroad, to affiliates of foreign manufacturers, or to firms that authorize the use of their trademarks abroad. Consequently, a multibillion dollar industry has emerged around the parallel importation of foreign-manufactured merchandise bearing United States trademarks.

In the face of this longstanding interpretation of § 526's reach, respondent Coalition to Preserve the Integrity of American Trademarks and its members, most of whom are United States trademark holders or affiliates of United States trademark holders that compete against the gray market, have waged a full-scale battle in legislative, executive,

and administrative fora against the Customs Service regulation, and particularly the common-control exception, 19 CFR §§ 133.21(c)(1) and (c)(2) (1987). See Eisler, Gray-Market Mayhem: It's Makers vs. Importers in Lobbying Onslaught, Legal Times, Nov. 17, 1986, p. 1, col. 1. Largely unsuccessful in the political branches, they have more recently brought the battle to the courts, asserting that Treasury is (and, since 1922, has been) statutorily required to extend to them the same exclusionary powers as it extends to what the Court refers to as the "prototypical gray-market victim." *Ante*, at 286.[1] This is such a suit.

There is no dispute that § 526 protects the trademark holder in the first of the three gray-market contexts identified by the Court—the prototypical gray-market situation in which a domestic firm purchases from an independent foreign firm the rights to register and use in the United States a foreign trademark (case 1). See *ante*, at 292. The dispute in this litigation centers almost exclusively around the second context, involving a foreign manufacturer that is in some way affiliated with the United States trademark holder, whether the trademark holder is a subsidiary of (case 2a), the parent of (case 2b), or the same as (case 2c), the foreign manufacturer. The Customs Service's common-control exception denudes the trademark holder of § 526's protection in each of the foregoing cases. I concur in the Court's judgment that the common-control exception is consistent with § 526, but I reach that conclusion through an analysis that differs from JUSTICE KENNEDY's. See *ante*, at 292–293.

Also at issue, although the parties and *amici* give it short shrift, is the third context (case 3), in which the domestic firm authorizes an independent foreign manufacturer to use its

---

[1] See, *e. g.*, *Olympus Corp.* v. *United States*, 792 F. 2d 315 (CA2 1986), aff'g 627 F. Supp. 911 (EDNY 1985), cert. pending, No. 86–757; *Vivitar Corp.* v. *United States*, 761 F. 2d 1552 (CA Fed. 1985), aff'g 593 F. Supp. 420 (Ct. Int'l Trade 1984), cert. denied, 474 U. S. 1055 (1986); *Lever Brothers Co.* v. *United States*, 652 F. Supp. 403 (DC 1987).

trademark abroad. See *ante*, at 287, 293–294. The Customs Service's authorized-use exception, 19 CFR § 133.21(c)(3) (1987), deprives the trademark holder of § 526's protection in such a situation. For reasons set forth in Part IV of this opinion, I dissent from the Court's judgment that the authorized-use exception is inconsistent with § 526.

## I

### A

An assessment of the reasonableness of the Customs Service's interpretation of § 526 of the 1930 Tariff Act begins, as always, with an assessment of "the particular statutory language at issue, as well as the language and design of the statute as a whole." *Ante*, at 291 (citations omitted). Section 526 requires consent of the trademark owner to import a United States trademarked product if (1) the product is "of foreign manufacture"; (2) the trademark it bears is "owned by" either a United States citizen or "a corporation . . . created or organized within . . . the United States"; and (3) "a person domiciled in the United States" registered the trademark.

The most blatant hint that Congress did not intend to extend § 526's protection to affiliates of foreign manufacturers (case 2) is the provision's protectionist, almost jingoist, flavor. Its structure bespeaks an intent, characteristic of the times, to protect only domestic interests. A foreign manufacturer that imports its trademarked products into the United States cannot invoke § 526 to prevent third parties from competing in the domestic market by buying the trademarked goods abroad and importing them here: The trademark is not "registered in the Patent and Trademark Office." The same manufacturer cannot protect itself against parallel importation merely by registering its trademark in the United States: It is not "a person domiciled in the United States." Nor can the manufacturer insulate itself by hiring a United States domiciliary to register the trademark: The

owner is not "organized within . . . the United States." For the same reason, it will not even suffice for the foreign manufacturer to incorporate a subsidiary here to register the trademark on the parent's behalf, if the foreign parent still owns the trademark.

The barriers that Congress erected seem calculated to serve no purpose other than to reserve exclusively to domestic, not foreign, interests the extraordinary protection that § 526 provides. But they are fragile barriers indeed if a foreign manufacturer might bypass them by the simple device of incorporating a shell domestic subsidiary and transferring to it a single asset—the United States trademark. Such a reading of § 526 seems entirely at odds with the protectionist sentiment that inspired the provision. If a foreign manufacturer could insulate itself so easily from the competition of parallel imports, much of § 526's limiting language would be pointless.

### B

The language of § 526 can reasonably be read, as the Customs Service has, to avoid such an anomaly. Section 526 defines neither "owned by" nor "of foreign manufacture," and both phrases admit of considerable ambiguity when applied to affiliates of foreign manufacturers. More specifically, in each of the disputed gray-market cases involving a domestic affiliate of a foreign manufacturer (case 2), it cannot be confidently discerned either which entity owns the trademark or whether the goods in question are "of foreign manufacture."

As every Member of this Court agrees, § 526 does not unambiguously cover the situation in which a domestic subsidiary of a foreign manufacturer registers its parent's trademark in the United States (case 2a), because the trademark is not clearly "owned by" a domestic firm. See *ante,* at 292; *post,* at 318 (opinion of SCALIA, J.). "The term ['owner'] is . . . nomen generalissimum, and its meaning is to be gathered from the connection in which it is used, and from the subject-matter to which it is applied." Black's Law Dic-

tionary 996 (5th ed. 1979). But whether "ownership" is the "[c]ollection of rights to use and enjoy property, including [the] right to transmit it to others," or "[t]he complete dominion, title, or proprietary right in a thing," or "[t]he entirety of the powers of use and disposal allowed by law," *id.*, at 997, the parent corporation—not the subsidiary whose every decision it controls—better fits the bill as the true owner of any property that the subsidiary nominally possesses. Cf. *Copperweld Corp.* v. *Independence Tube Corp.*, 467 U. S. 752, 771 (1984) (parent and wholly owned subsidiary cannot engage in "conspiracy" within meaning of § 1 of the Sherman Act, 15 U. S. C. § 1, because they "*always* have a 'unity of purpose or a common design'") (citation omitted) (emphasis in original). Because of this ambiguity "[t]he Patent and Trademark Office takes the position that ownership of marks among parent-subsidiary corporations . . . is largely a matter to be decided between the parties themselves." 1 J. McCarthy, Trademarks and Unfair Competition 748 (2d ed., 1984) (footnote omitted).

The same ambiguity does not, of course, infect cases 2b and 2c. A domestic parent plainly owns the trademark registered in its name, whether or not it also owns a manufacturing subsidiary (case 2b) or division (case 2c) abroad. Nevertheless, § 526 does not unambiguously cover cases 2b and 2c because it is unclear whether merchandise manufactured abroad by a division or a subsidiary of a domestic firm is "merchandise of foreign manufacture." That phrase could readily be interpreted to mean either "merchandise manufactured in a *foreign country*" or "merchandise manufactured by a *foreigner*." Under the former definition, the merchandise manufactured abroad in cases 2b and 2c would fall within § 526's ban. Under the latter definition, however, the coverage is not as clear. Surely a domestic firm that establishes a manufacturing facility abroad (case 2c) is not in any sense a foreigner, and it is at the very least reasonable to view as "American" the foreign subsidiary of a domestic firm.

## II

Even if the language of § 526 clearly covered all affiliates of foreign manufacturers, "[i]t is a 'familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers.'"[2]  It is therefore appropriate to turn to our other "traditional tools of statutory construction" for clues of congressional intent.  *INS* v. *Cardoza-Fonseca*, 480 U. S. 421, 446 (1987).  The purpose and legislative history of § 526 confirm that if Congress had any intent as to the application of § 526 to affiliates of foreign manufacturers, it was that they ought not enjoy § 526's protection.  There is, admittedly, evidence suggesting that some legislators might have understood § 526 otherwise.  That evidence, however, is slim, ambiguous, and interspersed among more—and more convincing—evidence that Congress had a contrary intent.

## A

Section 526 can be fully understood only in the context of the controversial judicial opinion that spawned it.  In *A. Bourjois & Co.* v. *Katzel*, 275 F. 539 (CA2 1921), rev'd, 260 U. S. 689 (1923), a French producer of "Java" face powder sold to an independent United States company at a considerable premium all its United States business, along with its goodwill and full rights in its United States trademarks. The United States company, Bourjois & Co., registered the newly acquired trademarks under its own name and continued to import the powder from the French producer, selling it to domestic consumers under the French trademark and its own name.  All the while, the United States company went to great expense to develop an identity independent from

---

[2] *Steelworkers* v. *Weber*, 443 U. S. 193, 201 (1979) (quoting *Holy Trinity Church* v. *United States*, 143 U. S. 457, 459 (1892)).  See also *INS* v. *Cardoza-Fonseca*, 480 U. S. 421, 432, n. 12 (1987) (citing cases); *Kelly* v. *Robinson*, 479 U. S. 36, 43–44 (1986); *Offshore Logistics, Inc.* v. *Tallentire*, 477 U. S. 207, 220–221 (1986).

that of the French producer of its product. But much of the expense went to waste, for a competitor began to buy Java directly from the French producer abroad and market it here under the French trademark in competition with Bourjois. In sum, Bourjois was a "prototypical gray-market victim"—a United States trademark holder that purchased its trademark rights, at arm's length and at substantial cost, from an unaffiliated foreign producer. *Ante*, at 286.

Despite the apparent unfairness of the competition, the Court of Appeals for the Second Circuit declined to enjoin the encroachment on the trademark holder's newly purchased market. The court could find no trademark violation so long as the competitor's French labels accurately identified the product's manufacturer. It adhered to the then-prevailing "universality" theory of trademark law, a view that it had espoused for several years. See, *e. g.*, *Fred Gretsch Mfg. Co.* v. *Schoening*, 238 F. 780, 782 (1916). Under that view, trademarks do not confer on the owner property interests or monopoly power over intrabrand competition. Rather, they merely protect the public from deception by indicating "the origin of the goods they mark." *Katzel*, *supra*, at 543.

While Bourjois, the prototypical (case 1) gray-market victim, evoked little sympathy from the Court of Appeals, it would have been a far less sympathetic plaintiff had it not bargained and paid so dearly for the Java trademark and distribution rights. And the gray-market encroachment on the Java market would have been considerably less troubling had Bourjois had control over the foreign manufacturer's import conduct or over its sales abroad to third parties who might import; it would essentially have been seeking to protect itself from its own competition.

A comparison of Bourjois to the parties seeking § 526's protection in this litigation aptly illustrates the profound difference between the equities presented by the prototypical gray-market victim and those implicated in case 2. First,

the United States trademark holder that, like Bourjois, has purchased trademark rights at arm's length from an independent manufacturer stands to lose the full benefit of its bargain because of gray-market interference. In contrast, a United States trademark holder that acquires identical rights from an affiliate (case 2a) or creates identical rights itself and permits them to be used abroad by an affiliate (cases 2b and 2c) does not have the same sort of investment at stake.

Second, without § 526, the independent trademark purchaser has no direct control over the importation of competing goods, much less over the manufacturer's sale to third parties abroad. In contrast, if the gray market harms a United States trademark holder in case 2a, 2b, or 2c, that firm and its foreign affiliate (whether a parent, subsidiary, or division) can respond with a panoply of options that are unavailable to the independent purchaser of a foreign trademark. They could, for example, jointly decide in their mutual best interests that the manufacturer (1) should not import directly to any domestic purchaser other than its affiliate; (2) should, if legal, impose a restriction against resale (or against resale in the United States) as a condition on its sales abroad to potential parallel importers; or (3) should curtail sales abroad entirely.

These differences furnish perfectly rational reasons that Congress might have intended to distinguish between a domestic firm that purchases trademark rights from an independent foreign firm and one that either acquires identical rights from an affiliated foreign firm or develops identical rights and permits a manufacturing subsidiary or division to use them abroad.

### B

There is no dispute that the perceived inequity in case 1, as exemplified by *Katzel*, was the "major stimulus" for the enactment of § 526. *Coalition to Preserve the Integrity of American Trademarks* v. *United States*, 252 U. S. App. D. C. 342, 348, 790 F. 2d 903, 909 (1986) (hereafter *COPIAT*); see also

*Sturges* v. *Clark D. Pease, Inc.*, 48 F. 2d 1035, 1037 (CA2 1931) (A. Hand, J.); *Coty, Inc.* v. *Le Blume Import Co.*, 292 F. 264, 268–269 (SDNY 1923) (L. Hand, J.). United States trademark holders, many of which had purchased foreign trademarks from unrelated foreign corporations, demanded an immediate legislative response to *Katzel.* Congress responded with § 526 of the 1922 Tariff Act, without even waiting for this Court to reverse the Second Circuit (which it ultimately did three months later). The hastily drafted provision was introduced as a "midnight amendmen[t]" on the floor of the Senate, 62 Cong. Rec. 11602 (1922) (remarks of Sen. Moses), and allotted a miserly 10 minutes of debate, in the context of a debate on a comprehensive revision of tariff (not trademark) law. The specific wording of the response was by no means carefully considered, which provides all the more reason to avoid a hypertechnical interpretation that would "make trouble rather than allay it." *Fort Smith & Western R. Co.* v. *Mills*, 253 U. S. 206, 208 (1920); see *United States* v. *Bass*, 404 U. S. 336, 344 (1971).

The language that was originally introduced prohibited in essence the importation, without the trademark owner's consent, of "any merchandise if such merchandise . . . bears a trade-mark registered in the Patent Office by a person domiciled in the United States." 62 Cong. Rec. 11602 (1922). As initially drafted, § 526 lacked two of its three current limitations. See *supra*, at 297. First, it did not limit the import prohibition to goods that were "of foreign manufacture"; that limitation was added later by floor amendment when an opponent pointed out that the provision as written would preclude, for example, a United States citizen from importing a domestically manufactured product that had been exported to, and then purchased by him in, Canada. Second, the bill lacked the requirement that the trademark be "owned by a citizen of, or by a corporation or association created or organized within, the United States"; that limitation appeared for the first time, without explanation, in the Conference

Report. H. R. Conf. Rep. No. 1223, 67th Cong., 2d Sess. (1922). See *infra*, at 306–307.

The sparse legislative history confirms that Congress' sole goal was to overrule *Katzel*. Section 526's sponsors and proponents categorically rejected any suggestion that its effect might be broader than necessary to overrule *Katzel* on its facts. They emphasized repeatedly that § 526 would serve at the very most to protect domestic companies who (like Bourjois) purchased trademark rights from unrelated foreign manufacturers.[3] In fact, the first Senator to object to § 526 was troubled by the impropriety of enacting a provision designed to do no more than reverse *Katzel* while it was still pending before this Court, 62 Cong. Rec. 11603 (1922) ("[T]he *whole subject matter* involved in [§ 526] . . . has been heard in the circuit court of appeals [in *Katzel*] and is now on its way to the Supreme Court of the United States for final determination") (remarks of Sen. Moses), a characterization with which no one took issue.

If anything, the most outspoken supporters of § 526 characterized it as even more limited than *Katzel* for they seemed to have been operating under the mistaken impression that the French producer in *Katzel* was itself importing Java in competition with Bourjois and in violation of its agreement. Thus, several proponents, like Senator Sutherland, repeatedly described the "only aim" of § 526 as the "prevent[ion] [of] a palpable fraud," 62 Cong. Rec. 11603 (1922), or the protection of domestic firms that purchase trademarks from foreign manufacturers, which then "deliberately violate the property rights of those to whom they have sold these trade-marks by

---

[3] See 62 Cong. Rec. 11604 (1922) (bill's cosponsor, Sen. McCumber, complains that after *Katzel*, "the American *purchasers* of these [trademark] rights are entirely unprotected") (emphasis added); *ibid.* (purpose "is to give the opportunity to protect the American *purchaser*") (emphasis added) (remarks of Sen. McCumber); *ibid.* (Sen. Simmons describes case of domestic purchasers of Bayer Aspirin trademark from German company, whose investment § 526 would protect by precluding importation of aspirin by third party under same trademark).

shipping over to this country goods under those identical trade-marks." *Ibid.*[4]

The Court of Appeals read an exchange between Senators Lenroot and McCumber to suggest that § 526 could have been understood to go further than necessary merely to overrule *Katzel* on its facts.[5] The exchange began with Senator

[4] See also *id.*, at 11604 (describing § 526 as "a prohibition against the violation of . . . contract"; "In a thousand ways we have guarded against fraud, and this [is] one among the thousand") (remarks of Sen. McCumber).

It is conceivable, as the Court of Appeals suggested, that the quoted statements were merely "efforts by proponents of a bill to understate its significance," *COPIAT*, 252 U. S. App. D. C. 342, 350, 790 F. 2d 903, 911 (1986). But without firmer evidence tending to impugn a legislator's integrity, the presumption that legislators mean what they say would seem more appropriate than the opposite presumption that the Court of Appeals applied. At any rate, if a sponsor of legislation needs to understate the significance of a provision in order to secure its passage, it is reasonable to assume that other legislators relied on the sponsor's statements in casting their votes.

[5] The Court of Appeals also made much of a question posed by Senator Lenroot, which prompted an amendment of § 526 on the Senate floor. Senator Lenroot objected that under § 526, as originally drafted, a United States citizen who purchased an American product while in Canada could not carry the product across the United States border. In recognition of the absurdity of that result, Senator McCumber offered, and the Senate adopted, an amendment limiting the prohibition to goods "of foreign manufacture." 62 Cong. Rec. 11603–11604 (1922). The Court of Appeals thought it significant that Senator McCumber felt compelled to amend the provision rather than "simply noting (as the Customs Service would under its regulations) that the owners of the American and Canadian trademarks were the same company, or that the American trademark owner had authorized the use of the trademark." *COPIAT, supra,* at 350, 790 F. 2d, at 911. Senator McCumber's response is not as telling as the Court of Appeals suggests. In the first place, it is not at all clear that there was a Canadian trademark in Senator Lenroot's illustration. Second, even if such an assumption were implicit, a legislator's choice of one solution does not prove that he considered others nonviable. Third, the hypothetical demonstrated one respect in which the hastily drafted provision was not narrowly tailored to *Katzel*'s facts. Senator McCumber's prompt floor amendment is just as consistent with a motive to tailor the provision more to *Katzel*'s specific facts as it is with a suggestion that § 526 was never in-

Lenroot's inquiry whether § 526 would protect from parallel imports a foreign manufacturer whose "American *agents . . . register* a trade-mark . . . here in the United States," 62 Cong. Rec. at 11605 (emphasis added), to which Senator McCumber gave the following opaque response:

> "[I]f there has been no transfer of trade-mark, that presents an entirely different question. But suppose the trade-mark is owned exclusively by an American firm or corporation. The mere fact of a foreigner having a trade-mark and registering that trade-mark in the United States, and selling the goods in the United States through an *agency,* of course, would not be affected by this provision." *Ibid.* (emphasis added).

Dissatisfied with the response, Senator Lenroot rephrased the question: whether the foreign owner of "an international trade-mark . . . , *registered* by an American, with American *domicile*" could preclude parallel importation of the product "without the written consent of the [foreign firm], or their *agent domiciled* here in America." *Ibid.* (emphasis added). Time ran out before Senator McCumber could answer.

I disagree with both the inference that the Court of Appeals drew from Senator Lenroot's question and its reading of the answer. In the first place, the question, in either formulation, does not suggest that "Senator Lenroot . . . was concerned that foreign corporations could obtain the statutory monopoly simply by *incorporating* an American *subsidiary.*" *COPIAT,* 252 U. S. App. D. C., at 350, 790 F. 2d, at 911 (emphasis added). It refers only to the possibility of a foreign company "hav[ing] an agent" (not necessarily "incorporating a subsidiary") in the United States to "register" (not necessarily to "own") the foreign trademark. The question

---

tended to be so limited in the first place. Indeed, the Senators' concern that domestic companies not be shielded from importation of their own goods suggests a desire not to extend § 526's protection to domestic companies from the parallel imports disputed in this litigation over which they have control.

seems to have been directed to the inadvertent omission, subsequently remedied by the Conference Committee, of the requirement that the trademark be "owned by a citizen of, or by a corporation . . . created . . . within the United States."

Secondly, even if I could accept the conclusion that Senator Lenroot initially read § 526 as permitting a foreign firm to invoke § 526 merely through the artifice of creating a subsidiary, Senator McCumber's response laid to rest any such fear. He reiterated what had been said repeatedly: Section 526 would apply only to a situation in which there has been a "transfer"—presumably at arm's length—of the trademark; and only where the trademark "is owned exclusively—by an American"—presumably an exclusively American—firm. Thus, even if both Senators meant "subsidiary" when they used the word "agent," Senator McCumber's answer squarely negated any suggestion that § 526 would apply; such a situation, "of course, would not be affected by this provision."

## C

The sliver of legislative history on which the Court of Appeals relied most heavily in support of its reading of § 526 was the following statement in the Conference Report:

> "A recent decision of the circuit court of appeals holds that existing law does not prevent the importation of merchandise bearing the same trade-mark as merchandise of the United States, if the imported merchandise is genuine and if there is no fraud upon the public. [Section 526] makes such importation unlawful without the consent of the owner of the American trade-mark, in order to protect the American manufacturer or producer. . . ." H. R. Conf. Rep. No. 1223, 67th Cong., 2d Sess., at 158.

The Court of Appeals read the statement that § 526 "makes *such* importation unlawful" as meaning that § 526 would prevent the importation of *any* merchandise bearing a United

States trademark, so long as the imported merchandise is genuine and there is no fraud on the public, even though the holder of the United States trademark is affiliated with the manufacturer. That is, concededly, a plausible reading of that brief passage. But cf. Atwood, Import Restrictions on Trademarked Merchandise—The Role of the United States Bureau of Customs, 59 Trademark Rep. 301, 304 (1969) (describing Conference Report as "evidence of the misunderstanding of the facts of the Katzel case"). More plausible, though, is that the first sentence quoted above merely described the well-established legal theory that compelled the result in *Katzel*, and the second sentence, declaring the unlawfulness of "such importation" referred to the type of importation at issue in *Katzel—i. e.*, parallel importation of goods bearing a United States trademark *purchased* by an *independent* domestic company from a foreign manufacturer. Only if the second sentence were so limited would § 526 "protect the American manufacturer or producer," as the Conference Report itself says it does, for (as this case aptly demonstrates) the alternative would constitute Government-enforced insulation of the United States markets of foreign corporations.

As the Court of Appeals had to concede, *COPIAT, supra,* at 349, 790 F. 2d, at 910, its own reading imputed to Congress an intent to effect a sweeping transformation of the then-prevailing trademark doctrine. Congress, the argument goes, intended to reject squarely the Second Circuit's "universality theory" that a trademark was a device to protect the public against fraud by properly identifying the product's manufacturer, not a device to protect the trademark owner against competing sales of its own goods. See *supra,* at 301. When Congress intends to effect so radical a departure from prevailing legal doctrine, it ordinarily acknowledges as much and does so in more than a single cryptic comment in a conference report. Moreover, Congress typically would not sneak such a sweeping doctrinal change into a

massive legislative overhaul on an unrelated topic (here tariff revision). And it usually would (though did not here) refer the matter to the committee with expertise in the area. See 62 Cong. Rec. 11602 (1922) (remarks of Sen. Moses). Since Congress did not so much as hint that it was engaged in such an ambitious task, the more plausible reading of the cryptic Conference Report is that Congress intended merely to remedy a specific inequity that the prevailing doctrine produced, not to abolish the entire doctrine that produced it.[6]

In sum, the legislative history and purpose of § 526 confirm, and JUSTICE SCALIA does not dispute, that if Congress had any particular intent with respect to the application of § 526 to trademark owners affiliated with foreign manufacturers, it was to exclude them from its shield. At the very least, that interpretation—which forms the basis of the Customs Service regulation—is reasonable. See *Cardoza-Fonseca,* 480 U. S., at 445–449.

### III

The conclusion that the common-control exception is consistent with § 526 is further buttressed by the deference owed to an agency interpretation that represents a longstanding agency position. See *Zenith Radio Corp.* v. *United States,*

---

[6] If the congressional debates surrounding the initial enactment of § 526 were less than clear, the reenactment of § 526 in the 1930 Tariff Act was utterly confused. One proposal, which Congress ultimately rejected, was to substitute for § 526 a new and substantially different provision. See 71 Cong. Rec. 3871–3876, 3889–3906 (1929). The only two Senators who discussed § 526's current meaning mischaracterized it as a provision designed to protect United States trademark owners from infringement of their trademarks, rather than from the competition of valid trademarks. See *id.,* at 3837 (remarks of Sen. Reed); *id.,* at 3872 (remarks of Sen. George). The debates certainly do not evince the level of understanding that one might expect of a Legislature that only eight years earlier is said to have effected through that provision a sweeping doctrinal revision. Significantly, in discussing the reenactment of § 526, no one suggested that it was no longer limited to the facts of *Katzel,* as the Congress that originally enacted it intended.

437 U. S. 443, 450 (1978); *NLRB* v. *Bell Aerospace Co.*, 416 U. S. 267, 275 (1974). While the precise language of the importation bar has varied over the years, Treasury has for 50 years adhered to the basic premise of the common-control exception—that § 526 does not require exclusion of all gray-market goods.

Until 1936, Treasury's regulations merely tracked the language of § 526, see Cust. Reg. 1923, art. 476; Cust. Reg. 1931, arts. 517(*a*), 518, but respondents point to no evidence that the Customs Service had any practice of excluding goods bearing trademarks registered by affiliates of foreign corporations. That year Treasury explicitly adopted for the first time a "same-company" exception, which barred foreign manufactured goods bearing United States trademarks except if the foreign and domestic trademarks "are owned by the same person, partnership, association, or corporation." See T. D. 48537, 70 Treas. Dec. 336–337 (1936) (amending art. 518(b)). Contrary to the assertion of the Court of Appeals, *COPIAT*, 252 U. S. App. D. C., at 353, and n. 14, 790 F. 2d, at 914, and n. 14, Treasury's preamble specifically invoked its authority under §§ 526 and 624 of the 1930 Tariff Act (as well as § 27 of the Trade-Mark Act of 1905) in introducing the same-company exception. Treasury adhered to an identical same-company formulation of the exception upon reissuing the regulation in 1937, see Cust. Reg. 1937, arts. 536(*a*), 537; in 1943, see 19 CFR § 11.14(b) (1943); and in 1947, see 19 CFR § 11.14(b) (1947), each time citing specifically § 526 as partial authority for the interpretation. For 17 years thereafter, the regulation remained unchanged, and the Customs Service permitted parallel importation so long as the manufacturer and the United States trademark holder were affiliated, including situations where the holder was the manufacturer's subsidiary. See *In re Georg Jensen Inc.*, T. D. 52711, 86 Treas. Dec. 92 (1951); Derenberg, The Impact of the Antitrust Laws on Trade-Marks in Foreign Commerce, 27 N. Y. U. L. Rev. 414, 429 (1952).

In 1953, Treasury revised its regulations "[t]o eliminate obsolete material [and] correct discrepancies," T. D. 53399, 88 Treas. Dec. 376, that arose as international corporate relationships grew in complexity. It adhered to the same-company exception but enlarged it to encompass the situation in which the foreign manufacturer is a "related company as defined in section 45 of the [Lanham Trade-Mark] Act, [15 U. S. C. § 1127 (1982 ed. and Supp. IV)]," one that "legitimately controls, or is controlled by" the domestic trademark owner "in respect to the nature and quality of the goods in connection with which the mark is used." T. D. 53399, 88 Treas. Dec., at 384. Although the new regulations, for the first time, omitted reference to § 526, contemporaneous commentators uniformly recognized that the omission was inadvertent. See, e. g., Derenberg, The Seventh Year of Administration of the Lanham Trade-Mark Act of 1946, 44 Trade-Mark Rep. 991, 996–1000 (1954); Note, Trade-Mark Infringement: The Power of an American Trade-Mark Owner to Prevent the Importation of the Authentic Product Manufactured by a Foreign Company, 64 Yale L. J. 557, 559–562, 566–568 (1955). It would have been nonsensical in the extreme for Treasury to announce that goods excludable in any event under § 526 are not barred by the Lanham Trade-Mark Act.

That exception remained in place until 1959, when (for reasons not relevant here) Treasury deleted the related-company formulation of the exception and returned to the same-company formulation. Significantly, however, Treasury and the Customs Service continued to apply the provision as if the related-company language had still been there, permitting importation of gray-market goods where "the foreign producer is the parent or subsidiary of the American [trademark] owner or the firms are under a common control." T. D. 69–12(2), 3 Cust. Bull. 17 (1969); see also Letter from Deputy Customs Commissioner Flinn to Felix Levitan (Mar. 15, 1963), App. 63 (articulating Customs Service's "position

for many years" that § 526 is inapplicable where "merchandise [is] manufactured or sold by the foreign parent or subsidiary corporation of an American trademark owner").

In 1972, Treasury promulgated the current Customs Service regulation, with its common-control exception once more codifying the practice that the Customs Service has adhered to for 50 years. In sum, the agency has (to quote the Customs Service's long-time attorney) "always denied complete exclusionary protection to an American trademark registrant when it knew the importer to be a subsidiary or parent of the foreign user of the trademark." Atwood, 59 Trademark Rep., at 305–307. We do not lightly overturn administrative practices as longstanding as the ones challenged in this action. This is particularly true where, as here, an immense domestic retail industry has developed in reliance on that consistent interpretation. *Zenith Radio Corp.* v. *United States*, 437 U. S., at 457.

## IV

I turn now to my small area of disagreement with the Court's judgment—the Court's conclusion that the authorized-use exception embodied in 19 CFR § 133.21(c)(3) (1987) is inconsistent with the plain language of § 526. In my view, § 526 does not unambiguously protect from gray-market competition a United States trademark owner who authorizes the use of its trademark abroad by an independent manufacturer (case 3).

Unlike the variations of corporate affiliation in case 2, see *supra*, at 299, the ambiguity in § 526, .admittedly, is not immediately apparent in case 3. In that situation, the casual reader of the statute might suppose that the domestic firm still "own[s]" its trademark. Any such supposition as to the meaning of "owned by," however, bespeaks stolid anachronism not solid analysis. It follows only from an understanding of trademark law that established itself long after the 1922 enactment and 1930 reenactment of § 526. Cf. *Potomac Electric Power Co.* v. *Director, OWCP*, 449 U. S. 268, 280

(1980) (in interpreting a "statute enacted over 50 years ago, the view that once 'dominate[d] the field' is more enlightening than a recent state-law trend that has not motivated subsequent Congresses to amend the federal statute") (footnote omitted).

When § 526 was before Congress, the prevailing law held that a trademark's sole purpose was to identify for consumers the product's physical source or origin. See, *e. g., Macmahan Pharmacal Co.* v. *Denver Chemical Mfg. Co.*, 113 F. 468, 475 (CA8 1901). "Under this early 'source theory' of protection, trademark licensing was viewed as philosophically impossible, since licensing meant that the mark was being used by persons not associated with the real manufacturing 'source' in a strict, physical sense of the word." 1 McCarthy, Trademarks and Unfair Competition, at 826; see *Macmahan Pharmacal Co., supra*, at 475 ("An assignment or license without [a] transfer [of the business] is totally inconsistent with the theory upon which the value of a trademark depends"); H. Nims, The Law of Unfair Competition and Trade-Marks 46 (1917) (identifying *Macmahan* as "the usual rule"). Thus, any attempt by a trademark holder to authorize a third party to use its trademark worked an abandonment of the trademark, resulting in a relinquishment of ownership. See, *e. g., Everett O. Fisk & Co.* v. *Fisk Teachers' Agency, Inc.*, 3 F. 2d 7, 9 (CA8 1924).

Nor was it at all obvious then that a trademark owner could authorize the use of its trademark in one geographic area by selling it along with business and goodwill, while retaining ownership of the trademark in another geographic area. There were, as JUSTICE SCALIA points out, isolated suggestions that a foreign firm could validly assign to another the exclusive right to distribute th  assignor's goods here under the foreign trademark. See *post*, at 326. The cases, however, were rife with suggestions to the contrary.[7] And

[7] See, *e. g., Independent Baking Powder Co.* v. *Boorman*, 175 F. 448, 454 (CC NJ 1910) ("[T]he assignor cannot, after the assignment, continue

we have found no contemporaneous case even suggesting that a domestic firm could retain ownership of a trademark after attempting to assign to another the right to use the trademark on goods that the other manufactured abroad. Cf. *Scandinavia Belting Co.* v. *Asbestos & Rubber Works of America, Inc.*, 257 F. 937, 956 (CA2 1919) (raising similar issue whether assignee of right to use trademark in the United States might use trademark on products not produced by the foreign manufacturer, but concluding "[t]hat question is not here and is not decided"). As one commentator writing as late as 1932 observed: "[T]here is much confusion in the books in regard to the transferability of trade marks and trade names. The law on the matter is neither clearly stated nor always uniformly applied." Grismore, The Assignment of Trade Marks and Trade Names, 30 Mich. L. Rev. 490, 491.[8]

Not until the 1930's did a trend develop approving of trademark licensing—so long as the licensor controlled the quality of the licensee's products—on the theory that a trademark might also serve the function of identifying product quality for consumers. 1 McCarthy, Trademarks and Unfair Competition, at 827–829; see Grismore, 30 Mich. L. Rev., at 499.

---

the same identical business and at the same places as before, under unassigned trade-marks, and at the same time authorize his assignee to conduct the same business elsewhere under an assigned trade-mark"); *Eiseman* v. *Schiffer*, 157 F. 473 (CC SDNY 1907) (trademark owner may not assign trademark and then continue to engage in same business under different trademark).

[8] JUSTICE SCALIA cites *United Drug Co.* v. *Theodore Rectanus Co.*, 248 U. S. 90, 100–101 (1918), and *Hanover Star Milling Co.* v. *Metcalf*, 240 U. S. 403, 415 (1916), in support of his contention that the law by 1920 clearly permitted a trademark owner to retain ownership and use a trademark in one territory after assigning the identical trademark along with goodwill in another. *Post*, at 326. Those cases held only that a firm can develop a trademark that is identical to a trademark already in use in a geographically distinct and remote area if the firm is unaware of the identity. Thus, those cases bore on the territorial extent of trademark protection, not on the transferability of a trademark by territory once developed.

And not until the passage of the Lanham Trade-Mark Act in 1946 did that trend become the rule. See, *e. g.*, *Dawn Donut Co.* v. *Hart's Food Stores, Inc.*, 267 F. 2d 358, 366–367 (CA2 1959). Similarly, it was not until well after § 526's enactment that it became clear that a trademark owner could assign rights in a particular territory along with goodwill, while retaining ownership in another distinct territory. See, *e. g.*, *California Wine & Liquor Corp.* v. *William Zakon & Sons, Inc.*, 297 Mass. 373, 378, 8 N. E. 2d 812, 814 (1937).

Manifestly, the legislators who chose the term "owned by" viewed trademark ownership differently than we view it today. Any prescient legislator who could have contemplated that a trademark owner might license the use of its trademark would almost certainly have concluded that such a transaction would divest the licensor not only of the benefit of § 526's importation prohibition, but of *all* trademark protection; and anyone who gave thought to the possibility that a trademark holder might assign rights to use its trademark, along with business and goodwill, to an unrelated manufacturer in another territory had good reason to expect the same result. At the very least, it seems to me plain that Congress did not address case 3 any more clearly than it addressed case 2a, 2b, or 2c. To hold otherwise is to wrench statutory words out of their legislative and historical context and treat legislation as no more than a "collection of English words" rather than "a working instrument of government . . . ." *United States* v. *Dotterweich*, 320 U. S. 277, 280 (1943).

JUSTICE SCALIA's assertion that the foregoing analysis of case 3 is not based on the "resolution of textual 'ambiguity,'" *post*, at 323, depends on the proposition that an ancient statute is not ambiguous—and judges can never inform their interpretation with reference to legislative purpose—merely because the scope of its language has, by some fortuitous development, expanded to embrace situations that its drafters never anticipated. The proposition is unexceptionable where the postenactment development does not implicate the

*purpose* of the statute. Thus, to use JUSTICE SCALIA's illustration, no one would doubt that "[a] 19th-century statute criminalizing the theft of goods" applies unambiguously to "theft of microwave ovens," *post*, at 323, for the post-enactment development (the invention of new "goods") in no way implicates the statute's purpose (to deter "theft of goods"). The proposition is fallacious, however, when the postenactment development does implicate the statute's purpose. For example, had the same 19th-century legislature passed a statute requiring a utility commission to "inspect all ovens installed in a home for propensity to spew flames," the statute would not unambiguously apply to microwave or electric ovens. Although it would not be absurd to read the statute to cover such developments, a court might decline to do so, depending upon the extent to which the statute's purpose would be furthered by inspection of ovens that spew fewer flames than do conventional ovens. So too, the drastic doctrinal change in the nature of trademark ownership that occurred after § 526's enactment directly implicates the statute's purpose—to protect United States trademark owners from intrabrand competition arising from the manufacture abroad of trademarked goods by firms having certain relationships with the owner.

Since I believe that the application of § 526 to case 3 is ambiguous, the sole remaining question is whether Treasury's decision to exclude case 3 from § 526's prohibition is entitled to deference. The same considerations that lead me to uphold Treasury's treatment of the case 2 variations compel the same conclusion here. In the first place, the equities in case 3, as in case 2, differ significantly from the equities that motivated Congress to protect the prototypical gray-market victim (case 1) that purchases its trademark rights at arm's length from an independent manufacturer. While the prototypical gray-market victim stands to lose the full benefit of its bargain because of gray-market interference, the United States trademark holder that develops identical rights and

authorizes a third party to use them abroad does not have the same sort of investment at stake. Similarly, while a trademark purchaser has no direct control over the importation of competing goods or over the manufacturer's sale abroad to third parties, the holder of a United States trademark in case 3 can avoid competition simply by declining to license its use abroad or even (if contractually permitted) revoking an already-issued license. Thus, it would have been perfectly rational for Congress to treat case 3 like case 2, excluding both from the § 526's prohibition.

The legislative history that I have already discussed at length confirms Congress' intent to do exactly that, and merely to overrule *Katzel*. There is no more indication that Congress intended to permit a United States trademark holder to prohibit importation of trademarked goods manufactured abroad under its authorization than that Congress intended to permit a United States trademark holder to exclude goods produced by its affiliates or divisions abroad.

Finally, Treasury has, at least since 1951, declined to protect trademark holders who authorize the use of their trademarks abroad. Almost as soon as the Lanham Trade-Mark Act codified the quality theory, enabling trademark holders to license the use of their trademarks without thereby relinquishing ownership, see *supra*, at 311, the Customs Service took the position that § 526's protection would be unavailable to domestic firms that authorized independent foreign firms to use their trademarks. See Letter from Customs Commissioner Dow to Sen. Douglas (Mar. 23, 1951), App. 52, 53 ("[A] foreign subsidiary *or licensee* of the United States trademark is considered to stand in the same shoes as such trademark owner") (emphasis added). See also T. D. 69–12(2), 3 Cust. Bull., at 17. Particularly in light of that longstanding agency interpretation, I would uphold the authorized-use exception as reasonable.

JUSTICE SCALIA, with whom THE CHIEF JUSTICE, JUSTICE BLACKMUN, and JUSTICE O'CONNOR join, concurring in part and dissenting in part.

I agree with the Court's analytic approach to this matter, and with its conclusion that subsection (c)(3) of the regulation, 19 CFR § 133.21(c)(3) (1987), is not a permissible construction of § 526(a) of the Tariff Act of 1930, 19 U. S. C. § 1526(a). I therefore join Parts I, II–A, and II–C of the Court's opinion. In my view, however, subsections (c)(1) and (c)(2) of the regulation are also in conflict with the clear language of § 526(a). I therefore decline to join Parts II–B and III of JUSTICE KENNEDY's opinion and dissent from that part of the judgment upholding subsections (c)(1) and (c)(2).

I

The Court observes that the statutory phrase "owned by" is ambiguous when applied to domestic subsidiaries of foreign corporations (case 2a). With this much I agree. It may be reasonable for some purposes to say that a trademark nominally owned by a domestic subsidiary is "owned by" its foreign parent corporation. This lawsuit would be different if the Customs Service regulation at issue here did no more than resolve this arguable ambiguity, by providing that a domestic subsidiary of a foreign parent could not claim the protection of § 526(a). In fact, however, that has never been asserted to be the theory of the regulation, and is assuredly not its only, or even its principal, effect. The authority to clarify an ambiguity in a statute is not the authority to alter even its unambiguous applications, and § 526(a) unambiguously encompasses most of the situations that the regulation purports to exclude.

Thus, the regulation excludes from § 526(a)'s import prohibition products bearing a domestic trademark that have been manufactured abroad by the trademark owner (case 2c), or by the trademark owner's subsidiary (case 2b). But the statutory requirement that the trademark be "owned by" a

United States citizen or corporation is unambiguous with respect to these two cases. A parent corporation may or may not be said to "own" the assets owned by its subsidiary, but no matter how that ambiguity is resolved it is impossible to conclude that a trademark owned by a United States corporation and applied abroad either by the corporation or its foreign subsidiary is "owned by" anyone other than a United States corporation.

Five Members of the Court (hereinafter referred to as "the majority") assert, however, that the regulation's treatment of situations 2b and 2c is attributable to the resolution of yet another ambiguity in § 526(a). See *ante*, at 292–293 (opinion of KENNEDY, J.); *ante*, at 299 (opinion of BRENNAN, J.). The statute excludes only merchandise "of foreign manufacture," which the majority says might mean "manufactured by a foreigner" rather than "manufactured in a foreign country." I think not. Words, like syllables, acquire meaning not in isolation but within their context. While looking up the separate word "foreign" in a dictionary might produce the reading the majority suggests, that approach would also interpret the phrase "I have a foreign object in my eye" as referring, perhaps, to something from Italy. The phrase "of foreign manufacture" is a common usage, well understood to mean "manufactured abroad." Hence, when statutes and regulations intend to describe the universe of manufactured goods, they do not refer to goods "of foreign or citizen manufacture," but to goods "of foreign or domestic manufacture." See, *e. g.*, 19 CFR § 133.21(a) (1987). I know of no instance in which anyone, anywhere, has used the phrase with the meaning the majority suggests—and the majority provides no example.

In the particular context of the present statute, however, the majority's suggested interpretation is not merely unusual but inconceivable, since it would have the effect of eliminating § 526(a)'s protection for some trademark holders in case 1—which contains what the Court describes as the "proto-

typical" gray-market victims.   Not uncommonly a foreign trademark owner licenses an American firm to use its trademark in the United States and also licenses one or more other American firms to use the trademark in other countries.   In this situation, the firm with the United States license could not keep out gray-market imports manufactured abroad by the other American firms, since, under the majority's interpretation, the goods would not be "of foreign manufacture." Thus, to save the regulation, the majority proposes an interpretation that undermines even the core of the statute.[1]

The majority does not insist that this queer reading is the best interpretation of "of foreign manufacture," but only that the Customs Service has adopted this construction of the statute as the basis for its regulation.   That will come as a surprise to the Customs Service.   The Government's petition for writ of certiorari in this very case states that § 526(a) deals not with goods manufactured by foreigners, but rather with "goods manufactured abroad," "genuine foreign-made goods," "[g]enuine goods manufactured abroad," "goods produced abroad."   Pet. for Cert. in No. 86–625, p. 3.   As far as I can discern, that accords with the absolutely uniform Customs Service interpretation.   For example, the Customs

---

[1] JUSTICE KENNEDY suggests that "the regulation speaks to [this] hypothetical situation," since it "allows a company justifiably invoking the protection of the statute to bar the importation of goods of foreign or domestic manufacture.   19 CFR § 133.21(a) (1987)."   *Ante*, at 293, n. 4.   This suggestion is puzzling.   If, as the majority believes (or as it believes the Customs Service believes), the statute does not exclude the goods in this situation, it is hard to understand how the *regulation* could do so.   The reality, in any case, is that subsection (a) of § 133.21 has nothing to do with § 526(a), but rather implements § 42 of the Lanham Trade-Mark Act, 15 U. S. C. § 1124, which prohibits importation of goods of foreign or domestic manufacture bearing not genuine trademarks identical to a United States trademark, but trademarks that "copy or simulate" a recorded trademark.   It is subsection (b) of § 133.21 that implements § 526(a), and which, consistent with that statute, only prohibits importation of "[f]oreign-made [but not domestic-made] articles bearing a trademark identical with one owned" by a United States trademark holder.

Service cites (Brief for Federal Petitioners 38, n. 46) the 1951 correspondence from the Commissioner of Customs to Senator Douglas describing § 526(a):

> "As interpreted by the [Customs] Bureau, section 526 prohibits the importation of genuine articles *of foreign origin* bearing a genuine trade-mark. . . . For example: if the foreign owner of a trade-mark applied to *articles manufactured in a foreign country* assigns the United States rights [to a United States citizen] *no articles of foreign origin* bearing such mark . . . may be imported." App. 53 (emphasis added).

Perhaps most telling of all is the Commissioner's description, in this letter, of the common-ownership exception:

> "However, if the United States trade-mark owner and the owner of the foreign rights to the same mark are one and the same person, *articles produced and sold abroad* by the foreign owner may be imported by anyone. . . ." *Ibid.* (emphasis added).

The Commissioner's reference to articles produced and sold abroad was not original, but paraphrased the language of the earliest regulation articulating the common-ownership exception to § 526(a) ("merchandise manufactured or sold in a foreign country") which was reiterated in regulations promulgated in 1937, 1943, 1947, and 1969. See Cust. Reg. 1931, art. 518(b), as amended, T. D. 48537, 70 Treas. Dec. 336–337 (1936); Cust. Reg. 1937, art. 537(b); Cust. Reg. 1943, 19 CFR § 11.14(b) (1943); Cust. Reg. 1947, 19 CFR § 11.14(b) (1947); 19 CFR § 11.14(b) (1969). It is a strange sort of deference to agency interpretation which adopts a view of the statute that the agency clearly rejects.

If it were, as JUSTICE KENNEDY believes, "the current interpretation of the regulations we are sustaining," *ante*, at 293, n. 4, one would expect there to be in place some mechanism that enables the Customs Service to identify goods that are not only manufactured abroad but also (as the majority's

interpretation requires) manufactured by foreigners. Acquiring this knowledge cannot be easy, since the importer of merchandise will often not know the manufacturer's identity, much less its corporate pedigree. International corporate ownership, not a matter of public record, is often a closely guarded secret. Yet although there *is* in place a regulation requiring the country of origin (*i. e.*, whether "manufactured abroad") to be plainly indicated on all imports, see 19 CFR §§ 134.0–134.55 (1987), there is none requiring the nationality of the manufacturer to be stated. After today's decision, of course, the Customs Service, if it would not rather amend its regulations, will presumably have to devise means to enforce what we say it has been enforcing.

Which suggests one of the most important reasons we defer to an agency's construction of a statute: its expert knowledge of the interpretation's practical consequences. Since the Government has never advocated the interpretation proposed by the majority (although these cases have been argued twice), and since we did not so much as ask for additional briefing after conceiving of the novel interpretation, we cannot be sure what other difficulties it will create. It might, for example, conflict with mutually accepted understandings of our commercial treaty commitments to foreign countries, such as the provision in our Treaty of Friendship, Commerce and Navigation with the Federal Republic of Germany, October 29, 1954, that "[n]ationals and companies of either Party shall be accorded national treatment and most-favored-nation treatment by the other Party with respect to all matters relating to importation and exportation." [1956] 7 U. S. T. 1839, T. I. A. S. No. 3593, art. XIV, ¶4. I doubt, in any case, that our trade partners will look favorably upon a regulation which, as now interpreted, treats goods manufactured by American companies on their soil more favorably than goods manufactured there by their own nationals.

I find it extraordinary for this Court, on the theory of deferring to an agency's judgment, to burden that agency with

an interpretation that it not only has never suggested, but that is contrary to ordinary usage, to the purposes of the statute, and to the interpretation the agency appears to have applied consistently for half a century.

## II

Section 526(a) also unambiguously embraces a third situation that the regulation excludes —namely, the situation (case 3) in which a domestic trademark owner and registrant authorizes a foreign firm to use its United States trademark abroad. There, the United States trademark is unambiguously "owned by" a United States firm, and registered by a firm "domiciled in the United States," and the goods sought to be imported are "of foreign manufacture." According to JUSTICE BRENNAN, however, thus reading the words to mean what they say "bespeaks stolid anachronism not solid analysis," because "[a]ny prescient legislator who could have contemplated that a trademark owner might license the use of its trademark would almost certainly have concluded that such a transaction would divest the licensor not only of the benefit of § 526's importation prohibition, but of *all* trademark protection." *Ante*, at 312, 315.

There may be an anachronism here, but if so it is the statute itself—which Congress has chosen not to update—and not the faithful reading of it to cover what it covers. JUSTICE BRENNAN characterizes his view as the resolution of textual "ambiguity," but it has nothing to do with that. A 19th-century statute criminalizing the theft of goods is not ambiguous in its application to the theft of microwave ovens simply because the legislators enacting it "were unlikely to have contemplated" those appliances; and a 1922 (or 1930) statute covering a "corporation . . . organized within, the United States" unambiguously includes a United States corporation that has licensed its trademark abroad, whether or not a United States corporation with that characteristic ex-

isted at the time.[2] JUSTICE BRENNAN is asserting that we have the power—indeed, the obligation, lest we commit a "stolid anachronism"—to decline to apply a statute to a situation that its language concededly covers, not on the ground that the enacting Congress actually intended but failed to express such an exception, nor even on the ground that failure to infer such an exception produces an absurd result, but on the ground that, *if* the enacting Congress had foreseen modern circumstances, it *would* have adopted such an exception, since otherwise the effect of the law would extend beyond its originally contemplated purpose. I confess never to have

---

[2] JUSTICE BRENNAN responds with the example of an old statute requiring agency inspection of "all ovens" for their propensity to spew flames. This statute is asserted to be ambiguous with respect to modern microwave or electric ovens because its purpose would not be served. *Ante*, at 315–316. With respect to microwave ovens there may indeed be an ambiguity—not because the purpose would not be served but because the term "oven" connotes "a heated enclosure," Webster's Third New International Dictionary 1605 (1981), and may or may not embrace microwave ovens. With respect to electric ovens, there seems to me no ambiguity at all. Perhaps the statute should not be interpreted to cover electric ovens, but if so it would not be because of ambiguity but because (1) electric ovens are incapable of spewing flames, (2) it is therefore absurd to inspect electric ovens for that propensity, and (3) it is a venerable principle that a law will not be interpreted to produce absurd results.

"The common sense of man approves the judgment mentioned by Puffendorf, that the Bolognian law which enacted 'that whoever drew blood in the streets should be punished with the utmost severity,' did not extend to the surgeon who opened the vein of a person that fell down in the street in a fit. The same common sense accepts the ruling, cited by Plowden, that the statute of 1st Edward II, which enacts that a prisoner who breaks prison shall be guilty of felony, does not extend to a prisoner who breaks out when the prison is on fire—'for he is not to be hanged because he would not stay to be burnt.'" *United States* v. *Kirby*, 7 Wall. 482, 487 (1869) (citations omitted).

Nothing in JUSTICE BRENNAN's example suggests that we can simply disregard a phrase, such as "corporation . . . organized within . . . the United States," whose unambiguous application produces a result that is not at all absurd but merely (in JUSTICE BRENNAN's estimation) beyond the contemplation of the enacting Congress.

heard of such a theory of statutory construction. The principle of our democratic system is not that each legislature enacts a purpose, independent of the language in a statute, which the courts must then perpetuate, assuring that it is fully achieved but never overshot by expanding or ignoring the statutory language as changing circumstances require. To the contrary, it seems to me the prerogative of each currently elected Congress to allow those laws which change has rendered nugatory to die an unobserved death if it no longer thinks their purposes worthwhile; and to allow those laws whose effects have been expanded by change to remain alive if it favors the new effects. In the last analysis it is JUSTICE BRENNAN's approach that "bespeaks stolid anachronism," because in theory it requires judges to rewrite the United States Code to accord with the unenacted purposes of Congresses long since called home. (The reality, I fear, may be even worse than the theory. In practice, the rewriting is less likely to accord with the legislative purposes of yesteryear than the judicial predelictions of today.)

But it is not really necessary to conduct the discourse at such a philosophical level in order to reject what JUSTICE BRENNAN proposes. For even those who would support the power of a court to disregard the plain application of a statute when changed circumstances cause its effects to exceed the original legislative purpose would concede, I must believe, that such power should be exercised only when (1) it is clear that the alleged changed circumstances were unknown to, and unenvisioned by, the enacting legislature, and (2) it is clear that they cause the challenged application of the statute to exceed its original purpose. Here both of those conditions, far from being clearly satisfied, are almost certainly not met.

JUSTICE BRENNAN asserts that legislators in 1922 or 1930 were unlikely to have contemplated that a trademark owner could assign his trademark unless he simultaneously conveyed the goodwill and business associated with the mark.

*Ante*, at 313–314. But the prohibition on assigning a trademark apart from its associated goodwill has not been eliminated. See 15 U. S. C. § 1060. And no more in 1922 than today did it preclude assignment of the trademark and goodwill on a region-by-region basis. By 1920, it was firmly established that unrelated businesses could own and use an identical trademark so long as the uses were confined to different and distinct regions. See *United Drug Co.* v. *Theodore Rectanus Co.*, 248 U. S. 90, 100–101 (1918); *Hanover Star Milling Co.* v. *Metcalf*, 240 U. S. 403, 415 (1916). As a consequence, a trademark holder doing business in two distinct territories was free to assign the business, goodwill, and rights to the trademark in one of the regions. See, *e. g.*, *Scandinavia Belting Co.* v. *Asbestos & Rubber Works of America, Inc.*, 257 F. 937, 953–956 (CA2 1919); *Battle Creek Toasted Corn Flake Co.* v. *Kellogg Toasted Corn Flake Co.*, 54 Ont. L. Rep. 537, 546, 550 (1923); see also *Apollinaris Co.* v. *Scherer*, 27 F. 18, 19–20 (CC SDNY 1886) (dicta); cf. *Saxlehner* v. *Eisner & Mendelson Co.*, 179 U. S. 19 (1900) (a trademark owner does not abandon his trademark if he continues to use it domestically while granting another party the exclusive right to sell the product in certain foreign countries).[3] Similarly, a firm that used its trademark in one

---

[3] JUSTICE BRENNAN's only attempt to provide case-law support for the proposition that regional trademark licensing was impermissible consists of a reference to dicta in *Independent Baking Powder Co.* v. *Boorman*, 175 F. 448 (CC NJ 1910), and *Eiseman* v. *Schiffer*, 157 F. 473 (CC SDNY 1907), see *ante*, at 313–314, n. 7. The latter case contains nothing more than statements of the principle that a trademark cannot be assigned separately from the business to which it pertains — which says nothing about whether business and trademark can be conveyed on a regional basis. The former case does contain the seemingly pertinent remark, quoted by JUSTICE BRENNAN, that "the assignor cannot, after the assignment, continue the same identical business and at the same places as before, under unassigned trade-marks, and at the same time authorize his assignee to conduct the same business *elsewhere* under an assigned trade-mark." 175 F., at 454 (emphasis added). On the facts of the case, however, "elsewhere" was elsewhere in the same market in which the licensor continued to do busi-

business, say manufacturing cola syrup, could transfer rights to use the trademark in another business, such as bottling cola-flavored soda. See *Coca-Cola Bottling Co.* v. *Coca-Cola Co.*, 269 F. 796, 806–808 (DC Del. 1920). It was also well established that different parties using an identical trademark in different regions, or for different purposes, could enter into a consent agreement authorizing each party to continue the nonconflicting uses. See *Waukesha Hygeia Mineral Springs Co.* v. *Hygeia Sparkling Distilled Water Co.*, 63 F. 438, 441 (CA7 1894). JUSTICE BRENNAN correctly notes that trademark law now recognizes, as it had only begun to recognize in 1930, that a trademark may be licensed for use by different firms in the same or overlapping regions, *ante*, at 314–315. That change in the law, however, plays almost no part in the application of § 526(a). Since international trademark licensing is interregional, a statute that applies only to imported goods is hardly affected by a change in trademark law concerning intraregional licensing. Finally, there is direct proof that Congress appreciated the possibility of territorial assignment of trademarks. JUSTICE BRENNAN acknowledges that the 1922 Congress was well aware of, and indeed was motivated by, the case of *A. Bourjois & Co.* v. *Katzel*, 275 F. 539 (CA2 1921), which presented a textbook example of an assignment of the right to use a trademark in a distinct market. Although Congress understood that a United States trademark owner could authorize the use of its mark abroad, Congress nonetheless chose not to create an exception to § 526(a) for that situation.

Nor does it seem to me that the second condition for disregarding the words of the statute is met: that the original legislative purpose is not served by its text. I cannot agree that "the equities in case 3 . . . differ significantly from the

---

ness. The basis of the holding and of the dictum was, once again, that a trademark is not assignable separately from the business to which it pertains. There is no reason to believe that the court, even in dictum, was addressing the question of regional licensing.

equities that motivated Congress to protect the prototypical gray-market victim (case 1)," the United States assignee of a foreign trademark. *Ante,* at 316. The United States assignee's innocent vulnerability to gray-market imports is no greater than that of the United States trademark owner who assigns the right to use his trademark abroad—and whom JUSTICE BRENNAN would deprive of § 526(a)'s protection. I cannot understand why the latter victim "does not have the same sort of investment at stake," *ante,* at 317. If anything, his investment may be even greater, consisting of the entire goodwill associated with his trademark in this country. Nor do I understand why he has more "direct control" over the harm, *ibid.* The means of control available to the United States assignor are precisely those available to the United States assignee: he can either decline to participate in the assignment from the beginning, or contractually preclude the other party to the assignment from parallel importation. The latter is as unlikely to be effective in the one case as in the other since the bulk of the gray market is attributable to third parties that are unaffiliated with either the manufacturer or the trademark holder. That same phenomenon renders inexplicable JUSTICE BRENNAN's perception that all affiliated trademark holders are less in need of, or less deserving of, § 526(a) protection against the products of their foreign affiliates. It is not the affiliates who are doing the damage but third parties.

In sum, while congressional attention to the problem addressed by § 526(a) may have been prompted by the gray-marketeering represented by *A. Bourjois & Co.* v. *Katzel, supra,* the language of the statute goes well beyond that narrow case to cover the same inequity in other contexts. Even if Congress could not have envisioned those other contexts I would find no reasonable basis to disregard what the statute plainly says; but to make the case complete, it surely must have envisioned them.

\* \* \*

I of course agree that to the extent § 526(a) is ambiguous we need only determine whether the Customs Service's interpretation of the statute is reasonable, see *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842–843 (1984). But we owe no deference to a construction that is contrary to the interpretation of the agency. I would therefore hold invalid, in addition to subsection (c)(3) of the regulation, subsections (c)(1) and (c)(2).