Jacinta SKUBEL, et al.

v.

Louis SULLIVAN, et al.

No. 3:90CV–00279 (EBB).

United States District Court,
D. Connecticut.

May 14, 1996.

Stephen Wizner, Yale Law School, New Haven, CT, Andrew Golub, Susman Godrey, L.L.P., Houston, TX, Lew Golinker, United Cerebral Palsy Assns., Ithaca, NY, for plaintiffs.

Deirdre Anne Martini, Linda A. Ruiz, Assistant U.S. Attorneys, Bridgeport, CT, Dean S. Landis, Jeffrey G. Micklos, U.S. Department of Health and Human Services, Health Care Financing Division, Baltimore, MD, Richard Lynch, Hugh Barber, Judith A. Merrill, Attorney General's Office, Health and Human Services, Hartford, CT, for defendants.

### RULING ON CROSS–MOTIONS FOR SUMMARY JUDGMENT AND PLAINTIFFS' MOTION TO STRIKE

ELLEN B. BURNS, Senior District Judge.

Plaintiff Jacinta Skubel ("Skubel") and intervenor-plaintiff Travis Hardy ("Hardy") brought this class action against Secretary of Health and Human Services ("HHS") Louis Sullivan and Associate Regional Administrator of the Health Care Financing Administration ("HCFA") Alfred Fuoroli (the "federal defendants"), as well as Commissioner of the Connecticut Department of Income Maintenance ("DIM") Audrey Rowe and Director of the Medical Care Administration of the DIM Linda Schofield (the "state defendants").[1] Plaintiffs' complaint alleges violations of the Administrative Procedure Act, 5 U.S.C. § 551 et seq., the Civil Rights Act of 1871, 42 U.S.C. § 1983, the Rehabilitation Act of 1973, 29 U.S.C. § 794, the Medicaid Act, 42 U.S.C. § 1396 et seq., and the Fifth and Fourteenth Amendments to the Constitution. Presently before the Court are plaintiffs' motion to strike and three motions for summary judgment, filed, respectively, by federal defendants, state defendants and plaintiffs.[2] For the following reasons, plaintiffs' motion for summary judgment [Doc. No. 101] is granted, defendants' motions for summary judgment [Docs. No. 108 & 114] are denied, and plaintiffs' motion to strike [Doc. No. 123] is denied as moot.

## BACKGROUND

### I. Statutory Framework

The Medicaid Act establishes a cooperative federal-state program designed to enable states to provide medical assistance and rehabilitation services to needy individuals. No state is obliged to participate in the Medicaid program. However, states which choose to participate must design a state plan conforming to the Medicaid Act and to the regulations promulgated thereunder.

The Medicaid Act requires, inter alia, that states provide medical assistance to all "categorically eligible" persons, i.e. persons who meet state-determined income levels and are aged, blind, disabled or members of families receiving Aid to Families with Dependent Children. 42 U.S.C. § 1396a(a)(10)(A)(i). States may choose to provide coverage to all persons who satisfy particular income guide-

---

1. All defendants were sued solely in their official capacities. Accordingly, the suit now continues against Donna Shalala in lieu of Louis Sullivan, Ronald Preston in lieu of Alfred Fuoroli, Joyce Thomas (Commissioner of the Department of Social Services, "DSS," the successor to the DIM) in lieu of Audrey Rowe, and Julie Pollard in lieu of Linda Schofield.

2. Plaintiffs move for summary judgment against the federal defendants solely based upon the Administrative Procedures Act claim and against the state defendants solely under Section 1983. Plaintiffs' claim under Section 1983 is purely derivative of their claim under the Administrative Procedures Act, as all parties concur that the state defendants' actions at issue in this case are only as justifiable as the federal policy upon which they are based.

lines, as well as to certain persons who would be eligible except that their incomes exceed the state-determined maximum. *Id.,* at §§ 1396a(a)(10)(A)(ii) & 1396a(a)(10)(C). In addition, a state may seek a waiver to its state plan to provide coverage to individuals who:

> would be eligible ... if they were in a medical institution, [and] with respect to whom there has been a determination that but for the provision of home or community-based services ... they would require the level of care provided in a hospital, nursing facility or intermediate care facility for the mentally retarded the cost of which could be reimbursed under the State plan ...

*Id.,* at § 1396a(a)(10)(A)(ii)(VI). Connecticut has received such a waiver.

The Medicaid Act requires participating states to provide several types of medical assistance, including inpatient and outpatient hospital services, laboratory and x-ray services, skilled nursing and physician services, nurse midwife services and certified nurse practitioner services. *Id.,* at § 1396d(a)(xi)(1–5), (17) & (21). In addition, all participating states are required to provide "home health care services" and may provide "private duty nursing services." *Id.,* at §§ 1396d(a)(xi)(7–8).[3] Connecticut has elected not to provide private duty nursing services.

According to regulations promulgated by the Department of Health, Education & Welfare (now superseded by HHS) shortly after passage of the Medicaid Act:

> (a) "Home health services" means the services in paragraph (b) of this section that are provided to a recipient—
>
> (1) At his place of residence, as specified in paragraph (c) of this section; and
>
> (2) On his physician's orders as part of a written plan of care that the physician reviews every 60 days.
>
> (b) Home health services include ...
>
> (1) Nursing service ...

> (2) Home health aide service ...
>
> (3) Medical supplies, equipment, and appliances
>
> .    .    .    .    .
>
> (c) A recipient's place of residence, for home health services, does not include a hospital, skilled nursing facility, or intermediate care facility ...

42 C.F.R. § 440.70.

Moreover, according to regulations promulgated with respect to private duty nursing services, such services are:

> for recipients who require more individual and continuous care than is available from a visiting nurse or routinely provided by the nursing staff of the hospital or skilled nursing facility. The services are provided—
>
> (a) By a registered [or] licensed practical nurse;
>
> (b) Under the direction of the recipient's physician; and
>
> (c) To a recipient in one or more of the following locations at the option of the state—
>
> (1) His or her own home;
>
> (2) A hospital; or
>
> (3) A skilled nursing facility.

42 C.F.R. § 440.80.

## II. Undisputed Material Facts

The following material facts are acknowledged as true by all parties.

Plaintiff Skubel was born on May 27, 1982, with lissencephaly, a severe congenital brain malformation. Mem.Supp.Pls.' Mot.Summ.J. at 5. Skubel requires, as a matter of medical necessity, the services of a home health nurse to keep her respiratory passages clear and to provide medication in a timely manner to arrest seizures. *Id.* Skubel's doctor has prescribed a minimum of 76 hours of nursing services per week, 56 of which are funded by Medicaid under Connecticut's home and com-

---

**3.** States must offer home health services to any individual who is entitled to nursing facility services. 42 U.S.C. § 1396a(a)(10)(D). In addition, under the Early and Periodic Screening, Diagnostic, and Treatment (EPSDT) program, states are required to offer all necessary health care, including home health services, to child recipients. *Id.,* at § 1396d(r)(5). In contrast, private duty nursing services are purely optional.

munity services waiver program. *Id.* The remaining 20 hours are covered by a private insurance plan. *Id.* Skubel attends public school and engages in various other activities outside of the home. *Id.*, at 6. During such activities, Skubel must be accompanied by a nurse. *Id.*

Intervenor-plaintiff Hardy was born on July 18, 1984, with multiple severe disabilities. *Id.*, at 7. Hardy breathes through a tracheotomy tube and requires, as a matter of medical necessity, constant attention from a nurse or family member to keep the tube clear. *Id.* Hardy's doctor has prescribed forty hours of nursing services per week, which is funded by Medicaid. *Id.* Hardy attends school, during which time he must be accompanied by a nurse. *Id.*

On May 12, 1988, Hardy's attorney received a letter from Connie Dubuque, a Nurse Consultant at the DIM, explaining that Medicaid would not cover nursing services for Hardy's trips to school. *Id.*, at 8. The letter stated that "[r]egulations limit home health service to the home ... [DIM policy] must conform to Federal Regulations ... Therefore, Title XIX could not fund home health nursing services provided in school." *Id.*

By letter dated August 12, 1988, former DIM Commissioner Thomas Heintz sought clarification from then HCFA Regional Administrator Fuoroli concerning the at-home limitation for home health nursing services. *Id.* In a response letter dated November 15, 1988, Fuoroli wrote:

> While I was considering the possibilities you presented of extending the definition of home to include school or a workplace, ... I became aware of a recent court case *Detsel v. Bowen* on this issue of private duty nursing in school ... The District Court, on September 22, 1988, upheld the Department['s] position and stated that the Department's decision to restrict coverage for private nursing care to care provided in the home, a hospital, or a skilled nursing facility is not unreasonable ... [S]ince HCFA does have a defined position that covered private duty nursing services will not be extended, without an exception such as a waiver, beyond settings specified in

the regulations, and this has recently been tested and upheld in District Court, my response to you must be that home health and private duty nursing services will only be covered in settings in the regulations. *Id.*, at 8–9.

On October 9, 1989, plaintiffs' counsel sought an explanation from HCFA concerning the at-home limitation for home health nursing services. *Id.*, at 9. Fuoroli responded by letter dated November 3, 1989:

> As you know, 42 C.F.R. 440.70 requires that home health services can only be provided to a recipient at his place of residence which does not include a hospital, skilled nursing facility, or intermediate care facility.
>
> It is worth noting that in the *Detsel v. Bowen* case referred to in your letter, the U.S. District Court for the Northern District of New York upheld the U.S. Department of Human Services' position and stated that the Department's decision to restrict coverage for private duty nursing care (42 CFR 440.80) to care provided in the home, a hospital or a skilled nursing facility is not unreasonable.
>
> Like private duty nursing services, home health services are also limited to certain settings and can only be covered in the setting specified in the regulation at 42 CFR 440.70.

*Id.*, at 9–10.

On February 1, 1990, the Second Circuit Court of Appeals overturned the District Court's *Detsel* decision. *Detsel v. Sullivan*, 895 F.2d 58 (2d Cir.1990). In light of this decision, then DIM Director of Medical Care Administration Schofield wrote to Fuoroli seeking clarification of the at-home limitation for home health nursing services. Pl.'s Mem. Supp.Mot.Summ.J. at 10. At the same time, plaintiffs' counsel also wrote to HCFA for clarification of the at-home limitation. *Id.*

By letter dated April 20, 1990, Fuoroli responded to plaintiffs' counsel as follows:

> Since the *Detsel* case dealt only with the place of service restrictions on private duty nursing services it does not apply to the long-standing regulation at 42 C.F.R. § 440.70 [which] requires that home health

services can only be provided to a recipient at his place of residence ... Therefore, my answer, at this time, must be that a State is not free, under the current regulation, to provide home health services to a recipient in a setting other than his place of residence.

*Id.,* at 10–11. Fuoroli then wrote to Schofield on May 4, 1990, stating that "absent a court order to the contrary, our current regulation at 42 C.F.R. § 440.70 remains in effect and places limitations on a State's ability to provide Federally funded home health services to a recipient in settings other than his place of residence." *Id.,* at 11.

By letter dated May 10, 1990, Acting Medicaid Bureau Director Rozann Abato reiterated the same position, stating that home health services "must be limited to the physical confines of the recipients' home; we have no plan to extend the boundaries of the place of service limitations ... *Detsel v. Sullivan* did not consider or address the home health regulation ..." *Id.* In light of the position taken by HCFA and the Medicaid Bureau, DIM denied Skubel's request to have her home health nurse accompany her outside the home. *Id.*

Skubel brought the instant suit in June 1990, and on July 6, 1990, this Court preliminarily enjoined the defendants to allow Skubel to make use of home health nursing services outside the home. On March 31, 1992, this Court granted Hardy's Motion to Intervene[4] and Skubel's Motion for Class Certification. The Court certified the following class:

All persons in Connecticut who have been or in the future will be determined to be eligible for home health nursing services as defined at 42 C.F.R. § 440.770(a) and (b)(1) provided pursuant to the federal Medicaid Act, 42 U.S.C. § 1396 *et seq.,* who, pursuant to interpretations of the text of the Medicaid Act or its implement-

ing regulations, have been or will be limited in the receipt of those services to the physical confines of their homes and for whom home health nursing services are medically necessary when they leave their homes to engage in normal life activities. Ruling on Pending Motions, March 31, 1992, at 2. Moreover, the Court excluded from the class any persons seeking additional hours of Medicaid home health nursing services as a result of any invalidation of the at-home limitation. *Id.,* at 13.[5]

## DISCUSSION

Summary judgment pursuant to Federal Rule of Civil Procedure 56(c) is appropriate if the Court finds, after viewing the facts in the light most favorable to the non-moving party, that there is no genuine issue of material fact pertaining to a given issue, and that the moving party is entitled to judgment as a matter of law on that issue. Fed.R.Civ.Proc. 56(c). The burden is on the moving party to show that no material facts are in dispute. *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 57 (2d Cir.1987). A dispute over a material fact exists if the evidence would allow a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). The court's role in considering summary judgment is not to resolve disputed issues, but only to determine the existence of factual issues to be tried. *Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

Plaintiffs seek summary judgment declaring the at-home limitation to be arbitrary,

---

**4.** Hardy has been attending school with the assistance of his Medicaid home health nurse pursuant to an administrative exception. Pl.'s Mem. Supp.Mot.Summ.J. at 7.

**5.** As is discussed at length later in this opinion, the Court based this limitation upon a finding that "lifting the at-home limitation ... would not

expand the number of hours of home health nursing services to which ... any Medicaid recipient would be entitled nor would it change the overall population of individuals eligible to receive such services." Ruling on Pending Motions, at 17.

capricious and contrary to law, whereas defendants seek summary judgment upholding the limitation as either required by law or as a reasonable interpretation of the law. Defendants also assert, as a threshold matter, that summary judgment is appropriate against plaintiffs as a result of plaintiffs' failure to exhaust their administrative remedies by petitioning HHS for rulemaking under 5 U.S.C. § 553(e).[6]

### I. Exhaustion

■ The exhaustion doctrine is a "long settled rule of judicial administration" dictating that "no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51, 58 S.Ct. 459, 463–64, 82 L.Ed. 638 (1938). Moreover, the largely analogous doctrine of primary jurisdiction "requires judicial abstention in cases where protection of the integrity of a regulatory scheme dictates preliminary resort to the agency." *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 353, 83 S.Ct. 1715, 1736, 10 L.Ed.2d 915 (1963).

Traditionally, courts decline to hear cases based upon exhaustion and primary jurisdiction when plaintiffs have failed to exhaust all possible intra-agency hearings and appeals. *See generally* 2 Davis & Pierce, *Administrative Law* Chs. 14 & 15 (3rd ed.1994) (hereinafter "Davis") (discussing exhaustion and primary jurisdiction). However, courts have periodically applied these doctrines to cases in which plaintiffs have sought to overturn agency regulations without first petitioning for rulemaking. *See, e.g., Brown v. Secretary of Health & Human Servs.*, 46 F.3d 102 (1st Cir.1995); *South Hills Health Sys. v. Bowen*, 864 F.2d 1084 (3rd Cir.1988); *Kap-* *pelmann v. Delta Air Lines, Inc.*, 539 F.2d 165 (D.C.Cir.1976), *cert. denied*, 429 U.S. 1061, 97 S.Ct. 784, 50 L.Ed.2d 776 (1977). Since plaintiffs in the instant case did not petition for rulemaking, exhaustion and primary jurisdiction are potential bars to suit.[7]

■ Exhaustion and primary jurisdiction are not, however, ironclad rules of judicial administration. Rather, both are prudential doctrines, and are not applied when "considerations of individual justice, efficiency or wise judicial administration" counsel against operation of the doctrines. Davis, vol. 2, at 271 & 307; *see Weinberger v. Salfi*, 422 U.S. 749, 765, 95 S.Ct. 2457, 2466, 45 L.Ed.2d 522 (1975) ("[E]xhaustion should be applied with a regard for the particular administrative scheme at issue."); *United States v. Western Pacific R.R. Co.*, 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956) ("No fixed formula exists for applying the doctrine of primary jurisdiction. In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation.").

■ Generally, courts weigh five primary factors in considering whether to bar a suit based on exhaustion or primary jurisdiction:

(1) Whether the issue in question is such that the agency's expertise is particularly useful and uniformity of application is particularly important. *Kappelmann*, 539 F.2d at 169; Davis, vol. 2, at 279.

(2) Whether the issue is such that an agency record would be helpful to the court. *Weinberger*, 422 U.S. at 765, 95 S.Ct. at 2466; *Brown*, 46 F.3d at 114; *see Ricci v. Chicago Mercantile Exch.*, 409 U.S. 289, 302, 93 S.Ct. 573, 580, 34 L.Ed.2d 525 (1973) (finding that

---

6. The following discussion relies mainly on the undisputed facts set forth above. Where a genuine dispute exists with respect to a particular fact, the Court has not, of course, resolved that dispute. However, in several instances noted below, the Court has found no reasonable basis in the record for one party's assertions of fact, and the Court has therefore made findings with respect to such allegedly disputed facts. *See First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968) (holding that summary judgment is appropriate where non-moving party's evidence

in support of a material aspect of its pleadings lacks any probative force).

7. Plaintiffs assert that a petition for rulemaking was not an available remedy, because plaintiffs seek to challenge HHS's interpretation of its regulation, rather than the regulation itself. To the contrary, however, as is discussed later in this opinion, the core of plaintiffs' challenge ultimately concerns the validity of HHS's regulation rather than the agency's interpretation thereof.

application of primary jurisdiction doctrine is appropriate when agency resolution of an issue is likely to be of "material aid" to the court).

(3) Whether judicial abstention would help to avoid undue interference with the functioning of the agency. *Weinberger,* 422 U.S. at 765, 95 S.Ct. at 2466.

(4) Whether resort to administrative remedies would be futile, meaning that principles of judicial economy and individual justice counsel against requiring exhaustion. *Weinberger,* 422 U.S. at 765, 95 S.Ct. at 2466; *Brown,* 46 F.3d at 114–15.

(5) Whether requiring exhaustion would lead to undue delay. *Coit Independence Joint Venture v. FSLIC,* 489 U.S. 561, 586–87, 109 S.Ct. 1361, 1375–76, 103 L.Ed.2d 602 (1989); *Ricci,* 409 U.S. at 320–21, 93 S.Ct. at 589–90 (Marshall, J., dissenting); *see* Davis, vol. 2, at 302 ("Since *Ricci,* circuit courts almost invariably [apply] a balancing test in which they weigh [ ] potential delay ... against the advantages of applying the [primary jurisdiction] doctrine."); *see also* William V. Luneburg, *Petitioning Federal Agencies for Rulemaking: An Overview of Administrative and Judicial Practice and Some Recommendations for Improvement,* 1988 Wisc.L.Rev. 1, 55 (discussing extreme delays inherent in seeking relief through agency rulemaking).

■ In the instant case, the issue in question appears at first blush to be one in which agency expertise might be useful. However, as is discussed at length later in this opinion, HHS has consistently declined to bring its expertise to bear on the issue in question, instead basing the at-home limitation purely on what it deems to be a reasonable reading of the Medicaid Act.[8] When an agency's decision essentially turns on a question of law or statutory interpretation, courts generally find little or no reason to require

exhaustion of agency remedies, as agency expertise and an agency record are of minimal value. *Weinberger,* 422 U.S. at 765, 95 S.Ct. at 2466; *Brown,* 46 F.3d at 114–15; *Cf. Kappelmann,* 539 F.2d at 171 (applying primary jurisdiction doctrine where the issue in question " 'requires the resolution of issues which [are] within the special competence of an administrative body' [and] involves both technical and policy questions") (citations omitted).

Moreover, the instant case is not one in which an action by this Court would likely interfere with the proper functioning of HHS. It has now been over six years since the Second Circuit's decision in *Detsel,* a decision which HHS has acknowledged as involving an issue that is parallel and closely related to the issue in question in this case. Yet, HHS has declined to undertake any new rulemaking in light of *Detsel.* Whereas the defendants are correct that plaintiffs never formally petitioned for rulemaking, plaintiffs' letters clearly served as notice to HHS concerning the importance of re-evaluating its policies in light of *Detsel.* Indeed, the federal defendants' responses to plaintiffs' letters indicate that HHS did undertake at least a minimal re-assessment, choosing to maintain its at-home limitation for home health nursing services, even while eliminating the limitation for private duty nursing, as mandated by *Detsel.* Thus, the instant case cannot be framed as one in which plaintiffs "blind-sided" the agency by litigating a new issue which the agency had not had the opportunity to consider.[9]

Finally, and most significantly, as this Court found in its preliminary injunction ruling, HHS "has clearly stated [its] interpretation ... Under these circumstances, requiring the plaintiff[s] to exhaust [their] administrative remedies would be an exercise in futility." Ruling on Motion for Pre-

---

**8.** Both prior to and during the instant litigation, HHS has defended its at-home limitation based almost entirely upon the wording of the statute and regulations, and upon the level of deference due to agency interpretations. Moreover, as is discussed later in this opinion, the only substantive rationale offered by HHS—its alleged need to allocate scarce resources—is entirely unsupported.

**9.** Although the Court acknowledges that requiring exhaustion helps to promote uniform application of agency regulations, the Court does not consider this factor to be dispositive in this case, particularly in light of the fact that Medicaid varies substantially from state to state.

liminary Injunction, 1990 WL 125170 *7 n. 5. Indeed, former HCFA Regional Administrator Fuoroli wrote as early as November 15, 1988, that the at-home limitation was a "defined position," and subsequent correspondence between the parties only strengthened this conclusion.[10] Thus, it would be both a waste of judicial resources and a miscarriage of justice to require plaintiffs to petition for rulemaking.[11] The Court therefore proceeds to the merits of plaintiffs' claim.

## II. Standard of Review

In reviewing an agency's construction of the statute it administers, this Court must first consider whether Congress has directly spoken on the precise issue in question. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). If the intent of Congress is clear, then the Court must enforce Congress's will. *Id.* at 842–43, 104 S.Ct. at 2781–82. If, on the other hand, Congress has not directly addressed the issue in question, then the Court should defer to the agency's interpretation, provided it is a permissible construction of the statute. *Id.* at 843, 104 S.Ct. at 2782. Specifically, the Court must defer to any "reasonable" interpretation, and may only invalidate an interpretation that is "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844, 104 S.Ct. at 2782.

■ An analogous, though slightly more deferential, standard of review applies to an agency's interpretation of its own legislative regulations. Specifically, this Court should defer to such a regulatory interpretation unless it is "plainly erroneous or inconsistent with the regulation." *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945).[12] Moreover, it is clear that the *Seminole Rock* "plainly erroneous" standard permits invalidation of an agency regulatory interpretation that is contrary to a federal statute or the Constitution. Davis, vol. 1, at 284.

The *Seminole Rock* standard of review is somewhat more deferential than the *Chevron* standard, provided the interpretation in question is challenged as being contrary to the regulation itself. *See, e.g., Udall,* 380 U.S. at 16, 85 S.Ct. at 801 ("When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order."); *accord State of New York Dep't of Social Servs. v. Shalala,* 21 F.3d 485, 494 (2d Cir.1994).

■ However, in cases in which the basis for challenging an agency's regulatory interpretation is the empowering statute rather than the regulation, then the challenge to the regulatory interpretation effectively becomes a challenge to the regulation as well, and *Chevron* analysis applies. *See, e.g., Skandalis v. Rowe,* 14 F.3d 173, 178–79 (2d Cir.1994) (applying *Chevron* analysis to plaintiffs' challenge to HHS's interpretation of its regulations, where challenge was based on the Medicaid Act); *Detsel,* 895 F.2d at 62 (same).[13]

10. The federal defendants rely heavily on *South Hills,* 864 F.2d 1084. In *South Hills,* the Third Circuit found that the plaintiffs should be required to petition for rulemaking, despite the fact that the plaintiffs had requested re-examination of the regulations at issue, on the grounds that the plaintiffs' request had been "too situation specific and too informal." *Id.,* at 1095 n. 10. However, the defendants mischaracterize the record to the extent that they argue that the correspondence between the parties in the instant case amounted to no more than an "informal request" by the plaintiffs. Federal Defs.' Reply Brf. at 15. To the contrary, the substantial exchange of letters in this case clearly indicates that the federal defendants were asked both by plaintiffs and by the state defendants to re-evaluate their at-home limitation in light of *Detsel,* and

that the federal defendants consciously chose to maintain the limitation.

11. The Court is also mindful of the certain delay which would ensue should a petition for rulemaking be required in this case.

12. The *Seminole Rock* standard has been followed in a long line of cases. *See, e.g., Thomas Jefferson Univ. v. Shalala,* — U.S. —, —, 114 S.Ct. 2381, 2386, 129 L.Ed.2d 405 (1994); *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801–02, 13 L.Ed.2d 616 (1965).

13. Any other means of harmonizing *Chevron* and *Seminole Rock* would be anomalous, as any statute-based challenge to a regulatory interpretation necessarily comprises both a challenge to the interpretation, and, in the alternative, a challenge to the regulation.

For these reasons, *Chevron* analysis is appropriate in the instant case, in which plaintiffs assert a statute-based challenge to HHS's interpretation of its regulation.[14]

## III. Applying *Chevron*

### A. Congressional Intent

Under the first step of *Chevron*, this Court examines whether congressional intent is clear as to the propriety of HHS's at-home limitation. Plaintiffs and federal defendants agree that congressional intent is unclear, while state defendants assert that congressional intent is clear.

■ Under *Chevron* and its progeny, this Court is required to use "traditional tools of statutory construction" in order to divine whether or not Congress specifically addressed the precise issue in question. *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 300, 108 S.Ct. 1811, 1822, 100 L.Ed.2d 313 (1988); *INS v. Cardoza–Fonseca*, 480 U.S. 421, 446, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987); *Chevron*, 467 U.S. at 843 n. 9, 104 S.Ct. at 2782 n. 9. However, the Supreme Court has offered sharply conflicting signals as to which "traditional" tools are appropriate to consider. *Compare, e.g., K Mart*, 486 U.S. at 291, 108 S.Ct. at 1817 (holding that courts should examine the "language and design of the statute as a whole") *with K Mart*, 486 U.S. at 300–17, 108 S.Ct. at 1822–31 (Brennan, J., Marshall, J., and Stevens, J., concurring in part and dissenting in part) (discussing statutory purpose and legislative history) *with K–Mart*, 486 U.S. at 319, 108 S.Ct. at 1832 (Scalia, J., Rhenquist, J., Blackmun, J., and O'Connor, J., concurring in part and dissenting in part) (relying on the "ordinary usage" of the terms in question). In the instant case, however, whether the Court examines ordinary usage, the statute as a whole, analogous statutes, statutory purpose or legislative history, no clear congressional intent concerning the at-home limitation is discernable.

### 1. Ordinary Usage

The state defendants assert that congressional intent can clearly be discerned from the ordinary usage of the term "home" in 42 U.S.C. § 1396d(a)(xi)(7). *See* State Defs.' Summ.J.Brf. at 6–9 (discussing meaning of "home"). This Court concurs that Congress likely intended to give the word "home" its ordinary meaning. However, for the reasons set forth below, this Court also finds that Congress very likely intended to use the term "home" in a descriptive rather than limiting manner.

As noted by the Second Circuit in *Detsel*, when the Medicaid Act was passed and Medicaid regulations were first promulgated in the mid–1960s, a person needing constant or near-constant nursing services would necessarily be confined to a hospital or skilled nursing facility, or to the home. 895 F.2d at 64. Thus, in titling a particular type of services "home health care services," Congress was effectively describing the type of services it envisioned, but was likely not seeking to impose an at-home limitation. Indeed, given that technology did not at that time allow for persons such as Skubel and Hardy to leave the home, it would be curious to presume that Congress nevertheless foresaw future improvements in technology and consciously intended to limit nursing services to the home after the onset of such technological innovation. *See id.* (questioning HHS's assumption that private duty nursing regulations promulgated in the mid–1960s were intended to be limiting rather than descriptive).

**14.** The federal defendants applied *Chevron* analysis in their briefs. State defendants asserted that the *Seminole Rock* standard should apply, but also argued under *Chevron*, in the alternative. Plaintiffs primarily relied on *Chevron*, but argued in the alternative that the at-home limitation is in fact an interpretative rule, meaning that the appropriate standard of review is the far less deferential standard set forth in *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944). Pls.' Reply Brf. at 10. To the contrary, however, the at-home limitation is a legislative rather than interpretative rule, as it is a function of HHS's delegated power to make law through rules. *See* Davis, vol. 1, at 247 (distinguishing between legislative and interpretative rules). The *Detsel* court's brief reference to *Skidmore*, 895 F.2d at 65, must be seen as aberrant, given that the *Skidmore* standard applies only to interpretative rules, and that the *Detsel* opinion primarily adopts *Chevron* analysis.

Moreover, even to the extent that the word home is used in a limiting manner, it appears to impose only a limit on *who* may receive home health care services rather than on *where* such services may be administered. This distinction is evident from the regulations promulgated soon after passage of the Medicaid Act, in which a "residence" is defined merely as "not includ[ing] a hospital, skilled nursing facility, or intermediate care facility," 42 C.F.R. 440.70. By defining residence solely in the negative, the regulations reinforce Congress's apparent intention to distinguish between institutionalized persons and non-institutionalized persons, without addressing whether services provided to the latter must be confined solely to the home—a question which would have been largely hypothetical given the state of technology at the time.[15]

This Court is mindful that "[o]ur role is not to speculate as to what Congress might have intended had it considered the question, but rather to determine whether Congress actually had an intent." *Detsel*, 895 F.2d at 63. As shown above, in the instant case the plain meaning of the statutory language fails to reveal any clear congressional intent concerning the issue in question, because Congress almost certainly used the word "home" in a descriptive rather than limiting manner.[16]

## 2. Construing the Statute as a Whole

Plaintiffs and defendants alike point to various provisions of the Medicaid Act which they claim should inform one's interpretation of § 1396d(a)(xi)(7). However, the Court finds that none of these provisions is sufficient to indicate any clear congressional intent concerning the at-home limitation.

Defendants point to several provisions of the Medicaid Act which refer to "home and

community care," "community supported living arrangements," and "home and community-based services." 42 U.S.C. §§ 1396(a)(xi)(22), 1396d(a)(xi)(23) & 1396n(d). Defendants assert that Congress would have made use of one of these alternate phrases in § 1396d(a)(xi)(7), had Congress intended to provide home health services outside of the home.

However, defendants ignore that Congress uses the above terms to refer to a far broader range of services than is included in the term "home health care services." For instance, the Medicaid Act expressly defines "home and community-based services" as including home health care services, private duty nursing, case management services, homemaker services, home health aide services, personal care services, habilitation services, respite care, psychosocial services, mental health clinic services and adult day health services. 42 U.S.C. § 1396n(d)(5)(C)(i). The Medicaid Act similarly defines the terms "home and community care" and "community supported living arrangements" as including a broad range of services not included in § 1396d(a)(xi)(7) home health care services. 42 U.S.C. §§ 1396t(a) & 1396u(a).

Given that § 1396d(a)(xi)(7) home health care services are merely one small component of "home and community-based services," "home and community care" and "community supported living arrangements," as these terms have been defined by Congress, it would have been illogical for Congress to use the term "community" to designate the services set forth in § 1396(d)(xi)(a)(7). Most importantly, nowhere in the statute is the word "community" used to define or refer to permissible *locations* for the provision of care. Thus, one simply cannot infer that only services which are designated in part by the word

---

15. The federal defendants acknowledge the logic of the *Detsel* Court's analogous determination with respect to the private duty nursing regulation, stating that it "may be considered somewhat ambiguous as to whether [the regulation] is referring to the patient's place or residence as qualifying which residents may receive private duty nursing, or whether it is referring to the place where the services must be rendered." Federal Defs.' Reply Brf. at 14. Following the

same logic, the statutory phrase "home health care services" must be deemed to be equally ambiguous.

16. Similarly, the reports to Congress discussed at pages 12–13 of state defendants' summary judgment brief are clearly descriptive rather than limiting in their assertions that home health care services are provided in the home.

"community" are permitted to be provided outside of the home.

Plaintiffs, on the other hand, note that under 42 U.S.C. § 1396a(a)(19), participating states are required to design their state plans in such a way as to further "the best interests of the recipients." Based in part on this provision, numerous courts have found that the Medicaid Act should be liberally construed in favor of beneficiaries. *See, e.g., Friedman v. Secretary of Health & Human Servs.*, 819 F.2d 42, 45 (2d Cir.1987). Moreover, one of the purposes of the Medicaid Act, as stated in the statute itself, is to furnish "rehabilitation and other services to help [ ] families and individuals attain or retain capability for independence or self-care." 42 U.S.C. § 1396.

The cited provisions clearly indicate a general congressional intent to avoid technical statutory constructions which work to the detriment of beneficiaries, and to facilitate recipients' independence.[17] However, the provisions nevertheless fail to indicate any clear congressional intent concerning the at-home limitation. Analysis of the Medicaid Act as a whole thus fails to establish that Congress directly addressed the precise issue in question.

### 3. Inference by Analogy to the Medicare Act

Defendants also assert that congressional intent can be inferred by reference to the Medicare Act, 42 U.S.C. § 1395 *et seq.* In particular, defendants point to the Medicare Act's definition of "home health services" as services ". . . provided on a visiting basis in a place of residence used as [the recipient's] home." 42 U.S.C. § 1395x(m).

Analogy between the Medicare and Medicaid statutes is appropriate only to the extent that the two statutes are otherwise similar

with respect to the particular issue in question. *Compare, e.g., Case v. Weinberger,* 523 F.2d 602, 610 (2d Cir.1975) (holding that, despite "vast differences" between Medicare and Medicaid, Congress established identical Life Safety Codes for the two programs, meaning that courts should infer that the standards for granting waivers from these Codes are also identical) *with Roe v. Norton,* 522 F.2d 928, 933–34 n. 5 (2d Cir.1975) (noting that, in light of the significant differences in the means by which Medicare and Medicaid are administered, courts should not infer that the Medicaid program contains a "medical necessity" requirement analogous to that established as part of Medicare).

In the instant case, analogy to the Medicare statute is inappropriate. Under Medicare, as a condition of reimbursement for home health services, a recipient must be "confined to his home." 42 U.S.C. §§ 1395f(a)(2)(C) & 1395n(a)(2)(A). For this reason, the concurrent requirement that Medicare home health services be provided only in the home is entirely logical. In contrast, Medicaid contains no requirement that a recipient be confined to the home in order to be eligible for home health care services. Thus, there is no logic in inferring an at-home limitation in the Medicaid statute by analogy to Medicare. Rather, the Medicare definition of home health services substantially supports plaintiffs' argument by demonstrating Congress's ability specifically to require an at-home limitation when it so desires.[18]

### 4. Congressional Ratification

As part of the 1990 Omnibus Budget Reconciliation Act ("OBRA"), Congress amended the Medicaid Act to provide that, beginning in 1994, personal care services would become a specific subset of home

---

**17.** Defendants assert that the primary purpose of the Medicaid Act is to provide "medically necessary services," and that there is no question that the at-home limitation does not interfere with such services. Mem.Supp.Federal Defs.' Mot. Summ.J. at 15–17. However, providing medically necessary services is not the sole purpose of the Act, and the instant dispute, concerning the location in which medically necessary services may be provided, implicates the Act's secondary

goals of facilitating independence and community integration.

**18.** Although the cited Medicare provision tends to support plaintiffs' argument rather than that of the defendants, it is insufficient to indicate any clear congressional intent with respect to an at-home limitation for Medicaid home health care services.

health care services (thus making such services mandatory for all participating states), and could be "furnished in a home or other location." Pub.L. No. 101–508, § 4721, 104 Stat. 1388–194. However, as part of the 1993 OBRA, prior to the time that the 1990 amendment was to take effect, Congress again amended the Medicaid Act. In this amendment, Congress removed personal care services as a subset of home health care services (thus making such services optional once again), but maintained the provision that personal care services may be furnished outside of the home. Pub.L. No. 103–66, § 13601, 107 Stat. 612. Defendants assert that Congress's 1990 amendment should be viewed as a congressional ratification of the at-home limitation for home health nursing services, while plaintiffs contend that the amendment shows that HHS's at-home limitation contravenes the will of Congress.[19]

With respect to congressional ratification via legislative re-enactment, the Supreme Court has held that "[w]hen a Congress that re-enacts a statute voices its approval of an administrative or other interpretation thereof, Congress is treated as having adopted that interpretation." *United States v. Board of Comm'rs of Sheffield, Alabama*, 435 U.S. 110, 134, 98 S.Ct. 965, 980, 55 L.Ed.2d 148 (1978). The Second Circuit has interpreted this holding to mean that:

> [A] test is required to ascertain whether Congress has spoken clearly enough to constitute acceptance and approval of the administrative interpretation. Mere reenactment is insufficient. It must also appear that Congress expressed approval of the agency interpretation. That is to say, the doctrine applies when Congress indicates not only an awareness of the administrative view, but also takes an affirmative step to ratify it ... Additionally, the [Supreme] Court has further held that the

legislative history of a reenactment must show express approval of a longstanding administrative interpretation for it to be treated as ratified by Congress (citation omitted).

*Isaacs v. Bowen*, 865 F.2d 468, 473–74 (2d Cir.1989).

In the instant case, the 1990 amendment was enacted after the HCFA reversed its policy of allowing personal care services to be provided outside the home, and, particularly, after HCFA enforced this prohibition in the State of Minnesota. In response to this dispute, Minnesota Senator Durenberger introduced the amendment in order to "affirm the intent of Congress to provide financial coverage for personal care services performed during temporary excursions outside the four walls of the home." 136 Cong.Rec. S7023 (daily ed. May 24, 1990) (statement of Senator Durenberger). The House Budget Committee similarly indicated that the amendment was a reaffirmation of Congress's original intent rather than a change, noting that the HCFA "undermined Congressional intent by restricting the delivery of personal care service to an individual's home, thereby making the home as confining as an institution." H.R.Rep. No. 101–455, 101st Cong., 2d Sess.[20]

Thus, Congress's intention in passing the 1990 amendment was to clarify its original intent to allow personal care services to be furnished outside of the home. The additional change making such services mandatory was apparently an inadvertent error resulting from last-minute budget negotiations, which Congress discovered and corrected just prior to the 1994 effective date of the amendment. *See* 139 Cong.Rec. H6163 (statement of Representative Bliley) (explaining error in 1990 OBRA and reason for 1993

**19.** The parties do not address the 1993 amendment, which occurred subsequent to the parties' submission of their briefs.

**20.** The 1990 amendment was first proposed, though not passed, as part of the 1989 OBRA. At that time, the congressional record similarly reflects that the amendment was intended to reaffirm Congress's original intent. Specifically, the record states that:

> The effect [of HCFA's interpretation] is to severely limit the beneficiary's ability to live a normal life and, in some cases, to live in the community at all. In the view of the Committee, the HCFA interpretation is inconsistent with one of the broad purposes of the Medicaid program, to encourage the independence and integration into the community of low-income elderly and disabled individuals.

H.Rep. No. 101–247, 101st Cong., 1st Sess.

amendment). Congress's 1993 amendment, which left intact the provision allowing personal care services to be provided outside of the home, in no way marked a retreat from Congress's original intent.

Congress's 1990 and 1993 amendments therefore did not serve as a legislative ratification of the at-home limitation for home health nursing services. Whereas defendants argue that Congress ratified the limitation for nursing and other home health care services by overturning it only for personal care services, the record is clear that Congress did not even consider nursing and other home health care services. Rather, Congress concerned itself solely with personal care services, which had been the subject of a specific dispute brought to the attention of Senator Durenberger. There is no evidence that Congress expressly knew of or sanctioned the at-home limitation at issue in this case. Rather, the references in the legislative history to Congress's original intent to encourage independence and integration in the community strongly suggest that, had Congress considered the issue in question in this case, Congress would have overturned HHS's interpretation. Despite this strong likelihood, Congress clearly did not consider the home health nursing at-home limitation, meaning that this Court must find that Congress has not directly addressed the issue in question.

**B. Reasonableness of HHS's Interpretation**

██ Having determined that Congress has not directly addressed the at-home limitation, this Court must uphold the limitation unless it is "arbitrary, capricious, or manifestly contrary to the statute." *Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782. In order to find that an agency interpretation is permissible, the Court "need not conclude that the agency construction was the only one it permissibly could have adopted ... or even the reading that [this Court] would have reached

if the question initially had arisen in a judicial proceeding." *Id.* at 843 n. 11, 104 S.Ct. at 2782 n. 11.

However, " '[d]eference to [an] agency does not require [the Court] to abdicate the judicial duty carefully to review the record to ascertain that the agency has made a reasoned decision based on reasonable extrapolations from some reliable evidence.' " *Zhang v. Slattery,* 55 F.3d 732, 750 (2d Cir. 1995) (citation omitted), *cert. denied,* —— U.S. ——, 116 S.Ct. 1271, 134 L.Ed.2d 217 (1996). Rather, it remains an "axiom of administrative law that an agency's explanation of the basis for its decision must include a 'rational connection between the facts found and the choices made.' " *Bowen v. American Hosp. Ass'n,* 476 U.S. 610, 626, 106 S.Ct. 2101, 2112, 90 L.Ed.2d 584 (1986) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983) ("*State Farm* ")).

██ Moreover, in the context of this case, the Court is particularly mindful that "to engage in informed rulemaking," an agency "must consider varying interpretations and the wisdom of its policy on a continuing basis." *Chevron,* 467 U.S. at 863–64, 104 S.Ct. at 2792–93. Thus, agencies must consider "changing circumstances, particularly in areas characterized by rapid technological development." *Detsel,* 895 F.2d at 64.[21] However, changes in an agency's position over time must be explained by "reasoned analysis." *Rust v. Sullivan* 500 U.S. 173, 187, 111 S.Ct. 1759, 1769, 114 L.Ed.2d 233 (1991) (citing *State Farm,* 463 U.S. at 43, 103 S.Ct. at 2867); *accord Sprout v. United States,* 8 F.3d 118, 129 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2674, 129 L.Ed.2d 809 (1994).

In the instant case, the record reveals a striking lack of informed and reasoned analysis on the part of HHS. When the DIM, acting at the behest of plaintiff Hardy, first sought clarification of the at-home limitation

---

**21.** As noted by the *Detsel* Court, the Supreme Court has specifically held that "[r]egulatory agencies do not establish rules of conduct to last forever; they are supposed ... to adapt their rules and practices to the Nation's needs ... They are neither required nor supposed to regulate the present and the future within the inflexible limits of yesterday." *American Trucking Ass'ns, Inc. v. Atchison, Topeka & Santa Fe Ry. Co.,* 387 U.S. 397, 416, 87 S.Ct. 1608, 1618, 18 L.Ed.2d 847 (1967).

in August 1988, the HCFA offered no rationale for its policy, instead merely citing to the district court decision in *Detsel*. Notably, the HCFA in no way sought to distinguish home health nursing services from private duty nursing services. Rather, the HCFA treated the two programs indistinguishably, implicitly stating that the *Detsel* court's decision with respect to private duty nursing justified the at-home limitation for both programs. Moreover, in a response to plaintiffs' counsel a year later, the HCFA again cited *Detsel* as its only justification for the at-home limitation, and explicitly likened home health nursing to private duty nursing.

However, following the Second Circuit's reversal of the district court in *Detsel*, the HCFA and the Medicaid Bureau immediately undertook to distinguish home health nursing from private duty nursing in two letters to the DIM and one to plaintiffs' counsel. These letters are notable, and troubling, for two reasons. First, the three letters still offered no substantive rationale for the at-home limitation. Second, the letters also gave no substantive reason for distinguishing *Detsel*, instead tautologically stating that *Detsel* was not controlling because it involved a different program. Thus, as of the beginning of this litigation, HHS had clearly failed to explain the rationale for its decision, or to justify by "reasoned analysis" its change in position concerning the similarity between home health nursing and private duty nursing.

■ As a general matter, this Court cannot permit agencies to justify their policies via post-hoc explanations first raised during litigation. *See, e.g., Federal Power Comm'n v. Texaco, Inc.*, 417 U.S. 380, 397, 94 S.Ct. 2315, 2326, 41 L.Ed.2d 141 (1974) (an agency decision may only be upheld on appeal based upon rationales articulated by the agency contemporaneously with its decision, even if post-hoc rationales have merit); *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947) (same). The substantive arguments raised by the defendants in their briefs technically fall into the category of impermissible post-hoc rationalizations. However, given that this Court has excused the plaintiffs' failure to exhaust their

remedies by petitioning for rulemaking, the Court will presume that, had HHS set forth its policy in a denial of petition for rulemaking rather than in letters to the DIM and to the plaintiffs, HHS would have at that time made all the arguments that the agency and the state defendants have since made in their briefs to this Court.

The Court thus considers the merits of each argument set forth by the federal and state defendants as to the reasonableness of the at-home limitation. These arguments fall into three primary categories: (1) arguments based upon the statutory language, congressional intent, and the level of deference due to agency interpretations; (2) arguments tending to distinguish the instant case from *Detsel;* and (3) economic arguments.

### 1. Statutory Language, Congressional Intent & Deference

■ Although the federal defendants acknowledge that Congress has not directly addressed the issue in question, they use the bulk of their brief to argue that 42 C.F.R. § 440.70 and HHS's interpretation thereof is consistent with the statute and with congressional intent, and should be accorded deference by this Court. The statutory language and Congress's intent have been thoroughly discussed earlier in this opinion. However, the previous discussion can be summed up by two major points. First, Congress did not consider the issue in question when the Medicaid Act was passed, likely because technology had not advanced far enough to make the issue pertinent. Second, had Congress considered the issue, Congress would likely have adopted the plaintiffs' interpretation rather than the defendants' interpretation. Thus, the instant case is not one in which defendants can defend their construction as "permissible" and "reasonable" merely by pointing to the statute and to other indicia of congressional intent.

■ Although this Court will defer to a reasonable agency interpretation even if it is not the only possible construction or the most logical construction, this court cannot uphold the at-home limitation as a "reasoned decision" unless the policy has some logical basis consistent with the authority delegated

to HHS by Congress. For this reason, defendants' averments as to the deference owed to their construction are immaterial in the abstract; such deference is relevant only as it relates to specific substantive rationales for the at-home limitation, namely, the economic rationales discussed below. *See Detsel* 895 F.2d at 65 (holding that where agency "failed to produce any evidence indicating the rationale for [its] interpretation," agency cannot argue that "traditional deference to administrative action should alone be enough to carry the day").

## 2. Import of *Detsel*

Both state and federal defendants go to great lengths to distinguish *Detsel* by pointing out differences between home health nursing and private duty nursing. Among the differences cited are the fact that private duty nursing is an optional program, whereas home health nursing is mandatory; that private duty nursing is a 24–hour–a–day program, unlike home health nursing; that home health nursing may only be provided by an agency, whereas private duty nursing is provided directly by a nurse; that home health services must be reviewed by a physician every sixty days, unlike private duty nursing; and, of course, that the two programs arise under different provisions of the Medicaid Act and different regulations. However, the Court cannot conjecture why any of these differences are pertinent to the at-home limitation, nor do defendants' briefs set forth any cogent explanation in this regard.[22]

Most significantly, even if *Detsel* were not controlling authority, the case is certainly at least persuasive authority. Thus, rather than focusing on minor distinctions between the two programs at issue, this Court and the parties must consider the import of the fundamental tenets underlying the *Detsel* decision: (1) that agencies have a duty continually to reassess their regulations in light of changing circumstances, 895 F.2d at 64; (2) that the at-home limitation is based on "obsolete medical assumptions," *id.*, at 66; and (3)

that the at-home limitation leads to a net increase rather than a net decrease in government spending, *id.*

Defendants do not attempt to contest the first or second of the above points. Indeed, defendants freely admit that changing circumstances have made it possible for the first time for technology-dependent persons to easily leave their homes. *See, e.g.,* Mem.Supp.Federal Defs.' Mot.Summ.J. at 2–3 ("[P]laintiffs seek to enhance the quality of life for those persons who, because of technological advances, no longer are confined to institutions or their homes but may leave and go into the community."). The only part of *Detsel* that defendants contest is the *Detsel* Court's findings concerning cost. Indeed, defendants' economic arguments constitute the only true rationale offered for the at-home limitation. The limitation's validity therefore must rise or fall with the validity of these arguments.

## 3. Economic Rationales

In *Detsel*, the Second Circuit directly addressed the economic impact of the at-home limitation:

> [HHS] fails to show how the at-home limitation furthers any of the department's legitimate fiscal concerns. Medicaid pays for all the supplies and equipment that [the plaintiff] needs, whether she remains at home the entire day or attends school, and provides a private duty nurse around the clock in her home. Refusing to permit the nurse to accompany [plaintiff] to school in effects confines [plaintiff] to her home. But this saves no money, because Medicaid would still be responsible for paying the nurse for all the supplies and equipment while [plaintiff] remained at home. Moreover, since the state will be required to furnish a home tutor if [plaintiff] cannot attend school, [HHS's] interpretation would require a greater total expenditure of public resources. Thus the secretary is essentially asking us to accept under his general duty to conserve resources a rule that leads to no savings within his own

---

**22.** Indeed, as noted previously, prior to the Second Circuit's decision in *Detsel* the federal defendants themselves acknowledged that no serious

distinction existed between the two programs, at least with respect to the merits of the at-home limitation.

department and, indeed, to a net increase in overall public spending. This argument surely does not provide us with a reasonable basis for upholding his interpretation. 895 F.2d at 65.

In the same vein, this Court found in its preliminary injunction ruling that:

[HHS] has failed to demonstrate how the [at-home limitation] will save either the state or federal government any money ... the plaintiff seeks only to make more effective use of the services she already receives ... which defendants concede will not cost them one additional nickel. In fact, allowing the plaintiff's nurse to accompany her outside of her home ... would eliminate the cost of providing the plaintiff with a home tutor ...

Ruling on Motion for Preliminary Injunction, 1990 WL 125170 *5.

Thus, defendants have been on notice for some time as to the need to provide support for any assertions that the at-home limitation saves money. Whereas federal defendants have provided no such support, state defendants have attempted to provide support for three alleged types of cost increases, which are considered below.

**a. Increased Utilization**

The state defendants assert that invalidation of the at-home limitation would lead to increased utilization of services. In support of their argument, the state defendants correctly contend that the reasonableness of a regulation must be determined with respect to all affected recipients, not merely those in a given class. However, the state defendants ignore the fact that this Court's exclusion from the class of anyone seeking additional hours of services was purely redundant, because the at-home limitation in no way reduces the number of hours for which any recipient may be eligible. Rather, a recipient is eligible for a given number of hours of nursing services, irrespective of where those services are provided. Indeed, following *Detsel*, the HCFA itself acknowledged that no increased utilization would occur:

[I]f a recipient wants to obtain private duty nursing services to attend school or other activities outside of the home, but does not need such services in the home, hospital or [nursing facility], there is no basis for authorizing private duty nursing services. Rather, *only* those individuals who require and are authorized to receive private duty nursing services in the home, hospital or [nursing facility] setting may utilize their approved hours outside of those settings during those hours when the individual's normal life activities take him or her outside of those settings.

HCFA Medicaid Bureau Mem., Oct. 21, 1990, Medicare & Medicaid Guide (CCH) # 14,571 (emphasis in original).

Paragraph 13 of the affidavit submitted by former DIM Director of Medical Care Administration Linda Schofield asserts that "[i]t is reasonable to expect [increased utilization]." State Defs.' Stat. Undisputed Facts at 4, ¶ 13. However, to the extent that Ms. Schofield believes that there are currently recipients who do not request the full amount of services available to them but who will in the future do so if the at-home limitation is invalidated, Ms. Schofield's prediction lacks any reasonable basis. A recipient who currently functions adequately without a given set of services cannot suddenly declare that such services are medically necessary, and the state is required only to provide medically necessary services. *Beal v. Doe*, 432 U.S. 438, 444–45, 97 S.Ct. 2366, 2370–71, 53 L.Ed.2d 464 (1977). Moreover, with respect to any children whose schools have approved Board of Education nurses to accompany them to school, such children would be unable to now request Medicaid to cover such costs, as the nursing is not a medical necessity so long as it is already being paid for by another source.

Thus, the affidavit on which the state defendants rely lacks any probative force and therefore does not create a genuine dispute as to the issue of increased utilization. *First Nat'l Bank of Arizona*, 391 U.S. at 289, 88 S.Ct. at 1593.

**b. Cost–Shifting from Medicare**

The state defendants further assert that invalidation of the at-home limitation would increase state costs by leading to cost-shift-

ing from Medicare to Medicaid. However, such cost-shifting is impossible, much for the same reason that cost-shifting between Medicaid and local Boards of Education cannot occur. As discussed above, participating states need only cover services that are a medical necessity. Thus, a recipient who is jointly eligible under Medicare and Medicaid, and who receives nursing in his or her home which is covered by Medicare, cannot be said to have a medical necessity for home health nursing either inside or outside of the home. Thus, the Court finds that there exists no genuine dispute that cost-shifting of the type anticipated by state defendants cannot occur as a result of plaintiffs' requested relief.[23]

**c. Increased Administrative Costs**

Lastly, state defendants assert that they will incur increased administrative costs as a result of increased difficulty in distinguishing covered medical services from non-covered non-medical services. However, state defendants ignore the fact that the standard for determining eligibility for home health nursing will remain the same as it is currently. As discussed previously, even absent the at-home limitation, Medicaid recipients are only eligible for home health nursing to the extent that such services are medically necessary. While the Court recognizes that this standard may not always be easy to apply, this difficulty presently exists to an equal degree. Thus, the Court finds that there exists no genuine dispute that increased administrative costs cannot occur as a result of plaintiffs' requested relief.

**SUMMARY**

Defendants' at-home limitation does not represent a "reasoned decision," *Zhang,* 55 F.3d at 750, reflecting a "rational connection between the facts found and the choices made." *Bowen,* 476 U.S. at 626, 106 S.Ct. at 2112. Nor have the defendants considered "varying interpretations and the wisdom of [their] policy on a continuing basis," *Chevron,* 467 U.S. at 863–64, 104 S.Ct. at 2792–93, or taken into account "changing circumstances," in an area that is "characterized by rapid

technological development." *Detsel,* 895 F.2d at 64. Moreover, the federal defendants have shifted from treating home health nursing and private duty nursing identically for purposes of the at-home limitation, to a new position in which the two programs are treated differently, and the federal defendants have failed to explain this shift by "reasoned analysis," *Rust,* 500 U.S. at 187, 111 S.Ct. at 1769. For these reasons, the Court finds the at-home limitation to be arbitrary, capricious and an impermissible construction of the Medicaid Act.

Plaintiffs' motion for summary judgment [Doc. No. 101] is granted, defendants' motions for summary judgment [Docs. No. 108 & 114] are denied, and plaintiffs' motion to strike [Doc. No. 123] is denied as moot. Defendants are permanently enjoined to allow members of the plaintiff class, when they leave their homes to engage in normal life activities, to make use of their Medicaid home health services outside of the home, provided such services are medically necessary. The clerk shall enter judgment and close the file.

SO ORDERED.

---

**23.** Even if such cost-shifting could occur, it is unclear whether avoidance of such cost-shifting represents a sufficiently reasonable rationale, as

the federal government would save money as a result of the cost-shifting and no net loss of public funds would occur.